NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

KEANE-ALEXANDER CRAWFORD,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-10855
Trial Court No. 3AN-08-13715 CR

O P I N I O N

No. 2566 — September 8, 2017

Appeal from the Superior Court, Third Judicial District, Anchorage, Eric A. Aarseth, Patrick J. McKay, and Jack W. Smith, Judges.

Appearances: Keane-Alexander Crawford, *in propria persona*, Seward, for the Appellant. Andrew Steiner, Attorney at Law, Bend, Oregon, appearing at the Court's request to argue the Appellant's position. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee. Douglas O. Moody, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, appearing for *amicus curiae* Alaska Public Defender Agency, aligned with the Appellee. Chad Holt, Deputy Public Advocate, Anchorage (the brief), Margaret McWilliams, Assistant Public Advocate, Juneau (oral argument), and Richard Allen, Public Advocate, Anchorage, appearing for *amicus curiae* Office of Public Advocacy, aligned with the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

If a person is charged with a crime by the State of Alaska, and if that person is unable to afford a private defense attorney, that person is entitled to the services of a defense attorney at public expense under the auspices of either the Public Defender Agency or the Office of Public Advocacy.[1]

The pertinent statute, AS 18.85.100(a), actually declares that indigent criminal defendants are entitled to *two types* of services at public expense: (1) "to be represented ... by an attorney to the same extent as a person retaining an attorney is entitled", and (2) "to be provided with the necessary services and facilities of this representation, including investigation and other preparation."

Thus, when a criminal defendant receives the services of a court-appointed attorney through either the Public Defender Agency or the Office of Public Advocacy, the defendant is entitled to have the agency provide the necessary incidents of that legal representation — for example, to pay for any necessary clerical support, investigative services, and expert evaluations and testimony.

The defendant in this case, Keane-Alexander Crawford, was charged with murder for shooting and killing his sister's fiancé, Anthony Brown, following a physical altercation between the two men. Crawford qualified for representation at public expense, but he waived his right to counsel and chose to represent himself. (There were

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

[1] *See* AS 18.85.110(d) (the statute authorizing appointment of the Public Defender Agency) and AS 44.21.410(a)(5) (the statute authorizing the appointment of the Office of Public Advocacy in cases where the Public Defender Agency has a conflict).

various times during the trial court proceedings when Crawford received court-appointed "standby counsel" to assist him, but Crawford remained in control of the litigation of his case.)

At various times during the pre-trial proceedings in this case, Crawford asked the superior court to supply him with public funds to hire a number of expert witnesses. In one instance (a request to hire a DNA testing laboratory), Crawford identified the type of expert evidence that he wished to introduce, and he explained why he believed that this evidence would be important to his defense. After hearing Crawford's explanation, the superior court ruled that reasonable attorneys would not spend money for the DNA testing that Crawford proposed, so the superior court denied Crawford's request for funds. Crawford has not appealed this ruling.

Aside from this one instance, Crawford failed to apprise the superior court of concrete, case-specific reasons why he wanted to retain the various experts he talked about, and he failed to explain why these experts' evaluations or analyses would constitute a significant component of his defense case.

The superior court denied Crawford's various requests for public funds to hire experts, and Crawford now argues that the superior court's rulings on this issue violated his right to due process of law.

In particular, Crawford argues that the superior court committed error when the court denied Crawford's request for public funds to hire a medical expert. In his brief to this Court, Crawford asserts that he needed a medical expert who might support Crawford's assertions (1) that just before the shooting, the victim, Anthony Brown, strangled Crawford to the point where Crawford became unconscious or semi-conscious, and (2) that as a result of this alleged strangulation, even after Crawford regained consciousness, he was "deprived ... of the ability to accurately or rationally perceive his surroundings, including what he [mistakenly] believed to be his pursuit by Brown."

As we explain in more detail in this opinion, we reject Crawford's claim of error because Crawford never informed the superior court of this theory of relevance when he made his requests for a medical expert. Under the pertinent decisions of the United States Supreme Court, an indigent defendant who seeks public funding for an expert must affirmatively explain the significance of, and the need for, that particular type of expert analysis. Because Crawford never informed the superior court of the theory that he currently proposes for needing a medical expert's analysis, we hold that the superior court did not commit error when it denied Crawford's request for public funding.

To analyze Crawford's case, we must discuss other legal issues. Paramount among these issues is the question of whether an indigent criminal defendant is entitled to have the Public Defender Agency or the Office of Public Advocacy provide the funding for litigation support services — for example, clerical and secretarial services, investigative services, and consultation with experts — even though the indigent defendant declines legal representation at public expense through these agencies.

To answer this question, we must interpret AS 18.85.100(a) — the statute that guarantees indigent defendants "[representation] by an attorney to the same extent as a person retaining an attorney" and "the necessary services and facilities of this representation". More specifically, we must decide whether the services described in this statute are a unified package of services that indigent defendants are entitled to receive when they invoke their right to counsel at public expense — or whether, instead, indigent defendants have a right to demand that the Public Defender Agency or the Office of Public Advocacy provide them with ancillary "services and facilities" at public expense even if they reject the assistance of a publicly funded attorney.

In our earlier decision in Crawford's case — *Crawford v. State*, 337 P.3d 4 (Alaska App. 2014) — we addressed this question of statutory interpretation but did

not answer it. Instead, because this is an issue of first impression in Alaska, and because the resolution of this issue will obviously affect many other criminal defendants, we asked for supplemental briefing — not only from Crawford and the State, but also from the Public Defender Agency and the Office of Public Advocacy. When those two agencies informed us that their interests in this litigation were adverse to Crawford's interests, we allowed the agencies to file *amicus curiae* briefs, but we appointed independent counsel to argue Crawford's side of this issue.

Now, having fully considered this matter, we conclude that the various services described in AS 18.85.100(a)(1)-(2) are one integrated whole. The statute guarantees this package of services to indigent defendants who invoke their right to counsel at public expense. But the statute does not create separate and severable guarantees of public funding for each service listed in the statute.

We additionally conclude (for reasons explained in this opinion) that Alaska Administrative Rule 12(e) does not authorize a court to directly appoint investigators or experts for criminal defendants.

Administrative Rule 12(e) authorizes a court to appoint "counsel, or a guardian ad litem, or other representative" for an indigent person if the court determines that the appointment is not authorized by AS 18.85.100(a), and that the appointment is required by law or rule. Although Rule 12(e) anticipates that attorneys and guardians ad litem appointed under this rule might need the services of investigators or expert witnesses (and might ask the Court System to pay for these services), Rule 12(e) does not authorize a trial court to provide money directly to *pro se* defendants who wish to obtain these investigative or expert services.

Our interpretation of AS 18.85.100(a) and Administrative Rule 12(e) raises other significant questions.

First, there is the question of whether it is constitutional for a state to link representative services and ancillary services in this manner — that is, can the state require indigent criminal defendants to accept legal representation at public expense in order to obtain the other litigation support services at public expense?

Second, if it is *not* constitutional to link these services — in other words, if indigent defendants who reject legal representation at public expense are nevertheless entitled to public funding for other litigation support services such as clerical staff, investigators, and experts — then where is this public funding to come from?

We raise these questions because, ultimately, they must be answered, and because (depending on the answers) our legislature may be required to take action.

We now explain our conclusions in more detail.

*Crawford's constitutional right to have expert witnesses and other support services funded at public expense, even though Alaska statutes and court rules currently do not provide public funding for these support services*

As a matter of constitutional law, indigent criminal defendants have a circumscribed right to obtain the services of experts at public expense. The seminal case on this point of law is *Ake v. Oklahoma.* [2]

The indigent defendant in *Ake* was prosecuted for murder. Ake's attorney wished to present a defense of insanity, but the trial court refused a defense request to have Ake examined by a psychiatrist at public expense. [3] The Supreme Court reversed Ake's conviction, holding "that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the

---

[2]     *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

[3]     *Ake*, 470 U.S. at 72, 105 S.Ct. at 1090-91.

constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one."[4] More generally, the Supreme Court stated that the due process clause of the constitution guarantees indigent defendants "basic tools of an adequate defense".[5]

In *Ake*, this "basic tool of an adequate defense" was an evaluation by a psychiatrist. But other courts, relying on *Ake*, have held that this due process guarantee can apply to non-medical experts as well.[6]

Nevertheless, indigent criminal defendants are not entitled to experts at public expense simply for the asking. A defendant who seeks public funding for an expert under *Ake* must make a threshold showing that, given the facts of the case and given how the case will be litigated, the proposed expert's evaluation will be a significant component of the defense case.[7] Absent this showing, a court can properly deny a defendant's request for public funding.

The Supreme Court clarified this point in *Caldwell v. Mississippi*, 472 U.S. 320, 323-24 n. 1; 105 S.Ct. 2633, 2637 n. 1; 86 L.Ed.2d 231 (1985) — where the Court held that a trial court can properly deny a defendant's request for public funds to hire

---

[4]    *Id.*, 470 U.S. at 74, 105 S.Ct. at 1091-92.

[5]    *Id.*, 470 U.S. at 77, 105 S.Ct. at 1093.

[6]    *See State v. Wang*, 92 A.3d 220, 229 n. 14, 15 (Conn. 2014); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000) (DNA expert); *Richardson v. State*, 767 So.2d 195, 197-200 (Miss. 2000) (DNA expert); *People v. Dickerson*, 606 N.E.2d 762, 766-67 (Ill. App. 1992) (handwriting expert); *Ex Parte Moody*, 684 So.2d 114, 119 (Ala. 1996) (ballistics expert); *State v. Coker*, 412 N.W.2d 589, 593 (Iowa 1987) (toxicologist).

[7]    *See, e.g., Williams v. Ryan*, 623 F.3d 1258, 1268-69 (9th Cir. 2010); *Smith v. Workman*, 550 F.3d 1258, 1268-69 (10th Cir. 2008); *Williams v. Collins*, 989 F.2d 841, 844-45 (5th Cir. 1993); *State v. Harris*, 866 S.W.2d 583, 585-86 (Tenn. Crim. App. 1992).

experts when the defendant has offered only "undeveloped assertions that the requested assistance would be beneficial."

For the reasons we are about to explain, we conclude that, with one exception (the request for DNA testing that we previously referred to), Crawford failed to offer the superior court sufficient information as to why the evaluation and/or testimony of his proposed experts would be a significant component of his defense. Crawford therefore failed to make the threshold showing required by *Ake v. Oklahoma* and *Caldwell v. Mississippi*.

Because Crawford failed to meet this threshold showing, we need not decide whether an indigent defendant who shows a genuine need for experts or other litigation support services is entitled to public funding for these support services, even if the defendant rejects a court-appointed attorney — or whether, instead, the State of Alaska can require indigent defendants to accept legal representation at public expense (either through the Public Defender Agency or the Office of Public Advocacy) if the defendants wish to obtain public funds for litigation support services.

*A detailed look at the litigation of this issue in Crawford's case*

The pre-trial proceedings in Crawford's case lasted more than a year. During those months, Crawford indicated at various times that he wanted to consult a variety of experts in connection with his defense — including a medical expert, a psychiatric expert, a forensic DNA analyst, a toxicology expert, a "consciousness" expert, a "choking" expert, and an expert on child molestation. But most of these proposed experts were mentioned only in passing by Crawford and his standby attorneys.

There was one instance where Crawford offered a detailed explanation of why he believed that a particular expert's testimony would be a significant component

of his defense. Crawford told the superior court that he wanted to hire a DNA analyst to run another test of the victim's fingernails for DNA. Crawford believed that this DNA testing would show that the victim had sexually abused Crawford's children — unbeknownst to Crawford at the time of the shooting.

After hearing this offer of proof, the superior court concluded that a reasonable defense attorney would not spend the thousands of dollars it would take to procure this additional DNA testing, so the court denied Crawford's request for public funds to pay for the proposed testing. Crawford has not appealed this ruling.

The only other experts for whom Crawford offered any kind of explanation were the "medical" expert and the "psychiatric" expert that Crawford mentioned in his "[Criminal] Rule 16 Notice and Request for [Office of Public Advocacy] Assistance" filed in February 2009. In this pleading, Crawford announced that he intended to call a "medical expert" and a "psychiatric expert" at his trial.

With regard to the medical expert, Crawford stated that he intended to present testimony "regarding the physical effects of being choked unconscious[,] including the repetitive blackouts that defendant suffered on the night in question as a result of being assaulted by the alleged victim."

With regard to the psychiatric expert, Crawford stated that he intended to present testimony suggesting that his half-sister, Kerri Nichols (the fiancée of the shooting victim) had "symptoms of Dissociative Identity Disorder", and that this condition "[a]ffected her ability to accurately recall the [events] that occurred on the night in question."

About a week after Crawford filed this pleading, the State filed an objection to Crawford's notice, arguing that Crawford had failed to meaningfully comply with Criminal Rule 16 — both because he had failed to provide names and contact

information for these proposed experts, and also because he had failed to supply any information about what these experts' opinions would actually be.

This matter was discussed at a pre-trial conference the following month (March 2009). However, at this conference, Crawford did not offer any further description of the kind of medical expert he was talking about, or what role that expert's evaluation or testimony would play in Crawford's defense case.

At this pre-trial conference, an attorney from the Office of Public Advocacy offered to speak with Crawford to find out exactly "for what purpose ... the medical expert [would] be hired", and then to forward Crawford's request to the Department of Administration to see if they would approve the expense.

This matter was next mentioned again at a hearing in April, where the court addressed the State's objection to Crawford's notice of experts. During the discussion of whether Crawford's notice was adequate, Crawford told the court that he wanted to hire a medical expert "who [could] testify to [his] condition on that night." But Crawford also told the court that he had not yet identified any potential expert witnesses.

At another hearing held the following month (on May 5th), Crawford told the court that he still had not contacted any potential expert witnesses. At that point, Crawford's trial was scheduled to begin in seven weeks — on June 22, 2009.

On June 10th, at a pre-trial conference, the court addressed the fact that the scheduled trial date was approaching, and that Crawford still had not given the State notice of any medical expert. The court told Crawford that if he decided to get a medical expert, he needed to promptly notify the State of what that expert would testify about, so that the State would have sufficient opportunity to get their own expert.

The court held a trial call in Crawford's case the following week (on June 16th). At that trial call, the prosecutor told the court that Crawford had mentioned two potential witnesses — "one relating to strangulation, and one relating to child molesta-

tion" — but that Crawford had not yet given notice of who these experts were, or what their anticipated testimony might be.

In response, Crawford told the court only that he was "going to continue to try and find [an] expert", and he ultimately asked for a continuance of the trial to give him time to do so.

The record shows that, at this time, Crawford and his standby attorney at the time, Mark Pawlowski, were actively working on procuring unspecified expert witnesses. In Pawlowski's submission of expenses to the Court System, he listed 1.7 hours spent on June 9, 2009 "interview[ing] potential expert witnesses".

But on the morning of June 29th, when the parties assembled for trial, Crawford still had not yet given notice of any proposed experts.

As it turned out, the superior court continued Crawford's trial again, this time to give Crawford several weeks to litigate his alleged problems with the State's pre-trial discovery.

Then, on August 3, 2009, Crawford filed a pleading in which he announced that he was "terminating the services of Mark Pawlowski" as his standby counsel. In this pleading, Crawford complained that Pawlowski had not provided him with any assistance. In particular, Crawford complained that he still "[did] not yet have the name of even one potential expert witness or investigator."

At a pre-trial hearing held that same day, Crawford told the court that he still needed more time to contact potential medical experts. The court granted Crawford a three-month continuance for this purpose — rescheduling Crawford's trial for November 2, 2009.

We note, however, that the record contradicts Crawford's assertion that he "[did] not yet have the name of even one potential expert witness or investigator" at the beginning of August. The record shows that, as of mid-July, either Crawford or

Pawlowski *had* been in contact with a potential expert witness — although it was not the medical expert that Crawford had repeatedly referred to. Instead, Crawford and/or Pawlowski had contacted a DNA testing laboratory in Colorado to solicit their services.

This is demonstrated by the fact that on August 10th (one week after Crawford told the court that he did not have the name of a single potential expert witness), Crawford filed a *pro se* pleading in which he asked the superior court to order public funding under Administrative Rule 12(e)(5) in the amount of approximately $15,000 to pay for DNA analysis and expert witness fees.

Crawford's request was supported by a 3-page "Proposal for Requested Discovery". This document was generated by the Carlson Company, a DNA laboratory in Colorado, and it was dated July 21, 2009.

Thus, when Crawford told the court on August 3rd that he had not yet been able to contact any potential experts, this was not entirely accurate.

A few days after Crawford filed his request for public funds to pay for the Colorado laboratory's DNA testing, Crawford filed an "Affidavit [and] Request for Expedited Hearing on Funding of Necessary Defense Services". In this pleading, Crawford asserted that, under the Supreme Court's decision in *Ake v. Oklahoma*, he was entitled to public funding "for necessary investigative and expert witness services". But Crawford offered no specifics as to what investigative or expert witness services he was referring to — other than the request for DNA testing that he had already submitted.

At this point, as we noted earlier, Crawford's trial was scheduled for November 2, 2009. Crawford made no further application to the court concerning investigators or expert witnesses until his case was called for trial on November 2nd.

In the interim, new standby counsel (Glenda Kerry) had been appointed to assist Crawford, and Crawford's case had been re-assigned to Superior Court Judge Eric A. Aarseth.

2566

With the prospective jurors summoned and waiting, Judge Aarseth tried to make sure that there were no pending motions that needed to be resolved before jury selection began. It turned out that there was a problem securing the attendance of one of the witnesses that Crawford wanted to call, so Crawford agreed to a delay of the trial until that matter could be resolved.

Crawford then asked Judge Aarseth to address his earlier request for public funding "of some expert testing" (*i.e.*, the proposed DNA testing). But then Crawford switched gears — turning from his previous request for DNA testing, and addressing his desire to hire a "medical expert":

> *Crawford*: [O]ne of the many things I've requested from the beginning was a medical expert. I mean, I've said from the beginning, I — I know I shot the guy, but I was barely able to stand, walk, breathe, see, [or] think. There's a lot of pieces missing. I mean, I reckon I know what I told the cops, and what I can tell from bullet trajectories and things, [and] what I think happened isn't even what happened. And, I mean, an expert could be very beneficial to me on that issue[.]

Crawford then asserted that he wanted to hire even more experts:

> *Crawford*: It wasn't just that one [DNA] expert that [I] was asking for money for. It's really — I mean, the State has eight or ten experts. I wanted at least three or four on certain issues, and I never got a — I mean, it's kind of hard to get an expert lined up and ask the court for money when you don't have the money in the first place. So I was never able actually to get my hands on a medical doctor, you know, or any of the other — or a toxicology expert, because I never had the funding. So I couldn't really submit requests to pay this guy because I never had a guy to pay. ... [Y]ou know,

I'm going to trial with no experts against maybe ten experts [for the State].

Crawford then argued that, as a matter of constitutional right, "experts or other services should be provided [to indigent defendants] at public expense [if] a reasonable attorney would provide them for a defendant who had the ability to pay."

At this point, Judge Aarseth asked Crawford to specifically identify what experts and other services he was talking about:

> *The Court*: So let me ask you, Mr. Crawford, this: When have you provided me with a CV, or [with] any type of information about what [expert] witness it is that I'm supposed to [order] one of these public agencies [to] hire for you?
>
> *Crawford*: Well, ...
>
> *The Court*: I mean, what experts do you have lined up? Do you have names? Do you have CVs? Do you have any information at all?
>
> *Crawford*: What I — what I have is, I have contact information for experts. The only contact I've been able to make is through the mail. I had — I guess that was one of the reasons the Court appointed standby counsel, but ...
>
> *The Court*: Standby counsel is there to answer your questions. ... [But] she's not really ... representing you. Okay? Her job is not to independently create a defense or defense strategy for you. ... And so, ... you're telling me that you've done this research. But where is your request for — where is your list of [experts like], "I want this expert who's a DNA expert out of Colorado to come up [to Alaska] because he can give an opinion on [such] and such"?

*Crawford*: Right. Well, [that request for DNA testing] is in the file. There's no opinion to give, because the tests weren't done, because there was no money...

*The Court*: Well, I know you [don't have their] opinion, because you [have] to pay for that. But, I mean, where's the name? I haven't seen a list of names ...

*Crawford*: The name I have for ... the DNA expert is in the file — the name of the agency who would've done the testing. I actually — without any money at all, and [that has] been the difficulty: nobody really wants to talk to you if there's no money available. But I did talk — contact this company that does DNA testing. I sent them the paperwork I had on the State's DNA testing. They agreed to do testing. And they gave me a quote on the price, and I submitted that quote ...

*The Court*: And what would the DNA testing do?

[Crawford responded to the judge's question by asserting that, since the time of the shooting, Crawford had obtained information which led him to believe that the victim had sexually abused Crawford's children while Crawford was unconscious.]

*The Court*: Okay. Well, based upon what you're explaining to me, it seems unlikely that a reasonable attorney would've ordered the expense of getting a DNA expert. So for those independent grounds, then, I will [deny your] application for that money.

A few minutes later, Crawford's standby counsel (Glenda Kerry) addressed the court, declaring that she and Crawford had been in the process of obtaining a

toxicology expert and a local doctor, but they decided that their efforts were pointless if there was no money to pay the toxicologist's fee:

> *Ms. Kerry*: Judge, if I may: We were in the process of getting experts — toxicology — this is an expert case. [Mr. Crawford] needs experts to try this case, and the State has eight or ten. And we were in the process of getting experts. I know, locally, our doctor that I was in the process of contacting, and I think [this doctor] would've been excellent for this case. However, Judge Smith denied ... [Crawford's] motion for funding for experts. [8] And at that point, I could not, in good faith, you know, tell these experts to look at these reports and, you know, we wanted to retain them. We had no money; we weren't going to be able to retain them. So that's why you don't have any CVs or anything in front of you. And that's the only reason. We were going to do it.

For present purposes, the most significant aspect of Crawford's remarks, and of his standby counsel's remarks, is that neither of them offered a concrete description of what kind of analysis they wanted the doctor and the toxicologist to perform, and why their analyses would be important to Crawford's case. Judge Aarseth immediately pointed this out: "[There was] ... an opportunity to make that application, but the record [in front of me] doesn't support that."

There was no further discussion of these matters on November 2nd. But the start of Crawford's trial was delayed for other reasons, so the parties appeared in

---

[8] Superior Court Judge Jack W. Smith had earlier been assigned to Crawford's case. In August 2009, Crawford filed a written request under Administrative Rule 12(e)(5)(D) for $7500 in court system funds to pay for his proposed DNA testing. Judge Smith denied Crawford's request, ruling that it was inappropriate to spend court system money under Administrative Rule 12(e) when Crawford was eligible for complete legal representation — either by the Public Defender Agency or the Office of Public Advocacy — under AS 18.85.100(a).

court the next day (November 3rd), and Crawford again raised the issue of public funding for experts.

Judge Aarseth initially told Crawford that he could not get public money for experts unless he accepted court-appointed counsel.   But when the judge finished speaking, the lead prosecutor interjected that this was not necessarily true:

> *Prosecutor*: [Mr. Crawford] also has the ability to file with the Court [a] request for specific experts [and] for specific testing … [and] then the Court can review [the request] and make those ... determinations.   [But no such request] has ... occurred in this case.
>
> . . .
>
> *Crawford*: It … *has* occurred.   I — I … put in [my] request — request for an expedited hearing on the funding of defense costs.   … I put in the request for an expedited hearing on defense costs.   That's because I put in the original request for DNA testing [and] it was denied.   I put in a motion for reconsideration.   It was denied.   [And] I put in the request for [a] hearing on defense costs.
>
> ...   I put in the request for an expedited hearing on defense costs because I ... assumed that I would have multiple experts, just as the State has multiple experts.   The Court never granted that hearing, never gave me a hearing on that issue.   So there are — there are multiple experts I would have requested[.]
>
> . . .
>
> [I have made] multiple filings [on this issue].   And one of those was a request for an expedited hearing on defense costs.   … It was filed in mid-[September], and I would just like the Court to — I have a copy of it here.   …

*The Court*: Is this the one [titled] "Affidavit / Request for Expedited Hearing on Funding of Necessary Defense Services"?

*Crawford*: That is correct.

*The Court*: Okay. [In this motion, you say] you want a hearing, but you're not explaining ...

*Crawford*: Well, my — my [previous] motions had been denied, and my motion for reconsideration had been denied. ...

.  .  .

*The Court*: And Mr. Crawford, ... that is a tactical choice on your part, in terms of whether or not you want to provide the pleadings and make the record that you think might be necessary to support you on appeal. Choices that you have made from the beginning. ...

.  .  .

You know, ... the problem is that — I've looked at [your pleading]. There is no record in there. ... [F]rom what I can see, there is no ... adequate record ... where you ever established that a reasonable attorney would make the choices that you're making. ... [Or] whether [the Court System is] authorized and [has] the discretion to pay for these services, which I don't think you've established either. Okay?

.  .  .

[I]n terms of any showing that a reasonable attorney would've [hired these experts], or that the rules or statutes actually require this Court to provide this kind of money, or that this money actually exists, or should exist because of some rule, you haven't made that showing either. I know you think you have, but I don't think you have.

*Crawford*: I've offered the proof ...

*The Court*: A reviewing court may disagree with me, but your time to do that has passed. Okay?

*Crawford*: I've — I've offered — the proof is ...

*The Court*: No, ... you asked for hearing ...

*Crawford*: I have the proof here ...

*The Court*: And that's not the way it's going to happen. I'm not going to sit here — no, I'm not going to sit here and take oral motions all the time [just] because that's the way you want to do it. ...

*Crawford*: I waived 90 days [of speedy trial time], from August 3rd to November 2nd, to get experts.

*The Court*: Okay. Well, I don't see any motions in here identifying any experts. ... So apparently — I don't know whether you've been doing that or not. You say you have, but I don't see anything in here. You can say it all you want, ... but there's nothing here. ... You chose tactically to not make the record. Okay? If you don't ...

*Crawford*: No, I have made the record. ...

*The Court*: I disagree. Okay?

*Crawford*: Well, I'm offering proof right now, if you want the record, but ...

*The Court*: The time has passed for that, ... and I'm not going to take [your offer] orally. ... You should've provided a motion that presented all the arguments that you're trying to make now. The problem is ... that you make

very broad, ambiguous, vague requests that aren't followed up with any specificity. And then you expect everyone to read your mind. And now here we are, the day before trial, and you're thinking that somehow we're going to understand exactly what you wanted, or what you were thinking.

That is the problem with representing yourself, Mr. Crawford, is that you do not understand that it is your job to make ... the record that we can rule upon. ...

*Crawford*: I — I have to disagree with the assertion ... [that] the record was not made. ... I understand that I'm not an attorney and that I may make mistakes, but I'm disagreeing with the assertion that I made the mistake of not making the record for requesting the experts. There was nothing vague or ... broad about my request. ... I requested a medical expert in February. Look at what I — what I stated. One page: I made it very simple and very clear. ...

. . .

The — the toxicology has been a major issue that ... I've been over, and over, and over, and over in open court about. [And] the need for a medical expert. I've been over, and over, and over that in open court. I know you weren't here for all of [the prior proceedings], but I don't want the Court to say now that there's no records, when there's a lot of record.

*The Court*: Well, ... Mr. Crawford, my impression of what's in the record or what isn't in the record will be subject to review [on appeal] if there's a conviction.

When Judge Aarseth made this ruling at the November 3rd hearing, everyone anticipated that Crawford's trial would begin as soon as various pre-trial matters were resolved. Crawford himself spoke about "starting trial [on] Monday" —

*i.e.*, November 9th. But because of witness difficulties, Judge Aarseth decided not to call a jury for Monday.

During an ensuing discussion as to whether the superior court would supply the money for Crawford to investigate the whereabouts of a potential defense witness (a lay witness), the topic again turned to public funding for Crawford's expert witnesses. Crawford said to Judge Aarseth:

> *Crawford*: I told [my standby counsel] that I wanted to try to find ... specific experts: specific medical experts, toxicology experts, consciousness experts, choking experts, child molest[ation] experts — specific experts so I could do just as the court said, and present that [information]. And [my standby counsel] said I can't do that. How can I get any expert when — I can't even go ask them, when I already know [that] the Court's going to deny [the request for funds]? How can I, in good faith, go ask them to spend time on this [case] and let me present them as a potential expert ... when the Court's already said there's no money for it?

But again, Crawford offered no details as to why he wanted to consult these experts, or how their analyses would be significant components of Crawford's case.

This was the last pre-trial discussion of public funding for Crawford's proposed expert witnesses.

*Our analysis of this record*

During the pre-trial proceedings in this case, there were numerous discussions — both in pleadings and in court hearings — as to whether Crawford could secure public funds to hire investigators and experts. As we have explained, Crawford took the position that he had a constitutional right to obtain public funds to purchase any

defense services that a reasonable private attorney would purchase if the attorney's client had the means to pay for these services. But though the Supreme Court held in *Ake v. Oklahoma* that indigent criminal defendants have a right to obtain the services of certain experts at public expense, Crawford's formulation of this right is too broad.

Given a sufficiently wealthy client, there are many avenues of investigation and expert analysis that a reasonable attorney might pursue. As this Court observed in *State v. Jones*,

> If given an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might ... cheerfully log[] in many hours looking for the legal equivalent of a needle in a haystack. ... [A] millionaire might ... retain[] counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection but to basic fairness. In the real word, expenditure of time and effort is dependent on a reasonable indication of materiality.

759 P.2d 558, 572 (Alaska App. 1988) (quoting *United States v. DeCoster*, 624 F.2d 196, 211 (D.C. Cir. 1976) (en banc)).

The true test for whether an indigent defendant is entitled to public funds to hire an expert is the test set forth in *Ake v. Oklahoma* and in *Caldwell v. Mississippi*: whether the defendant has shown that the proposed expert analysis will be a significant component of the defense case. [9]

Although Crawford spoke repeatedly of his desire to consult various types of experts, there was only one instance where he offered a concrete reason why he wanted to retain a particular expert. This was in early November 2009, when Crawford

---

[9] *Caldwell*, 472 U.S. 320, 323-24 n. 1; 105 S.Ct. 2633, 2637 n. 1; 86 L.Ed.2d 231 (1985).

explained to Judge Aarseth why he wanted to conduct additional DNA testing of the victim's fingernails. After hearing Crawford's explanation, Judge Aarseth ruled that a reasonable attorney would not pay for Crawford's proposed DNA testing — a conclusion that we agree with, and a conclusion that Crawford has not appealed.

None of Crawford's other requests for expert witnesses were supported by a description of what, precisely, Crawford hoped to obtain from these experts' analyses, or how the proposed analyses would be significant components of Crawford's defense case.

We note, in particular, that Crawford never informed the superior court of the theory he asserts now on appeal: that the victim strangled him and that, because of this purported strangulation, Crawford was not only rendered semi-conscious or unconscious for a time, but also, upon regaining consciousness, Crawford's ability to perceive reality was impaired to the point where he mistakenly believed that the victim was attacking him with deadly force.

It is no doubt true, as both Crawford and his standby counsel asserted, that it was essentially impossible for Crawford to hire an expert without having money in hand. But the Supreme Court's rulings in *Ake v. Oklahoma* and in *Caldwell v. Mississippi* do not require the government to supply money directly to indigent defendants so that these defendants can hire their own experts. This matter is expressly addressed in *Ake*:

> [We do not] say ... that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent [expert in the appropriate field], and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

470 U.S. at 83, 105 S.Ct. at 1096.

Thus, *Ake* does not guarantee indigent defendants an expert *of their choosing* — only that indigent defendants must be supplied an expert who is qualified to conduct the type of analysis that the defendant has shown to be a significant component of the defense case.

In other words, *Ake* and *Caldwell* presuppose that the government need not supply money to hire experts for an indigent defendant *unless and until* the defendant affirmatively demonstrates a significant need for the proposed type of expert analysis. The defendant must first explain the significance of, and the need for, a particular type of expert analysis, and then money will be authorized so that the defendant can receive the services of a qualified expert in that field.

Crawford never made this showing. Accordingly, the superior court committed no error when it declined to provide public funds for the various expert witnesses that Crawford mentioned.

*We conclude that the Alaska Public Defender Agency is not required to fund ancillary litigation services for indigent defendants who decline to be represented by the Agency*

We have just concluded that Crawford failed to make a sufficient showing that he needed the various experts that he talked about during the trial court proceedings. Given that conclusion, the question of whether the Alaska Public Defender Agency would have been required under AS 18.85.100(a) to supply the funds for these experts is technically moot. But this issue has been fully briefed to us, and there is a strong need for judges and trial lawyers to know the answer to this question when this issue arises in the future.

For the reasons we are about to explain, we conclude that AS 18.85.100(a) — the statute that guarantees legal counsel for indigent criminal defendants — does not authorize public funding of clerical support, investigative services, and expert consultations for indigent criminal defendants who have waived their right to be represented by an attorney under the auspices of either the Public Defender Agency or the Office of Public Advocacy.

*The legislature's purpose in creating the Alaska Public Defender Agency*

We begin our analysis by explaining the Alaska legislature's reason for creating the Public Defender Agency. The legislature did so because it viewed the Agency as the best possible solution for a public problem: how to meet the State's constitutional obligation to provide legal counsel to indigent criminal defendants.

The historical background of this problem is explained in the Alaska Supreme Court's decision in *Jackson v. State*, 413 P.2d 488 (Alaska 1966).

When Alaska became a state in 1959, it was a "firmly established" legal doctrine that private attorneys had an obligation, as officers of the court, to represent indigent persons — either completely at their own expense, or with only such minimal payment as might be authorized by statute or court rule. In 1966, in *Jackson*, the Alaska Supreme Court explicitly re-affirmed this doctrine — holding that "an attorney appointed to represent an indigent prisoner in a criminal matter has no constitutional right to receive compensation for his services." [10]

Three years before *Jackson* was decided, the United States Supreme Court had issued its decision in *Gideon v. Wainwright* — a case that changed the landscape of

---

[10] *Jackson*, 413 P.2d at 490.

the criminal law by holding that indigent criminal defendants have a constitutional right to the assistance of an attorney. [11] Because of the *Gideon* decision, private attorneys were finding themselves conscripted much more frequently to represent indigent defendants in criminal cases.

The Alaska Supreme Court acknowledged this reality in *Jackson* — the fact that *Gideon* had substantially broadened "the [private bar's] obligation of representing indigents with relatively little compensation". [12] Nevertheless, the supreme court declared that "[t]he problem of providing some means of adequately compensating [private] counsel [tasked with] representing indigents ... is a matter fundamentally for legislative and not judicial treatment." [13]

The supreme court noted that it had promulgated a court rule which authorized court-appointed attorneys to "receive certain minimal fees for their services". [14] But the supreme court indicated that trial courts had no power to order payment of sums larger than those specified in the court rule — and the supreme court suggested that the courts had no power to enforce even the minimal fees specified in the court rule if the legislature declined to appropriate funds for this purpose: "[T]he problem of securing funds to pay the amount now permitted by court rule, or to pay larger sums than those presently permitted, is entirely a matter for decision by the legislature." [15]

---

[11] *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *see also Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

[12] *Jackson*, 413 P.2d at 490.

[13] *Ibid.*

[14] *Ibid.*

[15] *Ibid.*

– 26 –                                                                                          2566

Ultimately, twenty-one years later, our supreme court overruled *Jackson* and held that private attorneys could not be compelled to represent indigent criminal defendants without just compensation. [16] But no one could have predicted this at the time the supreme court issued its decision in *Jackson*.

So instead, in 1969, the Alaska legislature took action to address the need to provide adequate funding for the representation of indigent criminal defendants. The legislature's answer was to create the Alaska Public Defender Agency. *See* AS 18.85, enacted by SLA 1969, ch. 109.

The House Judiciary Committee Report that accompanied this legislation[17] stated that the Public Defender Agency was being established "to assure needy defendants of adequate legal representation" and "to more equitably distribute the public obligation to provide this representation."

The Judiciary Committee noted that the constitutional obligation to provide legal representation to indigent defendants was falling almost entirely on members of the private bar. The Committee declared that the purpose of creating a Public Defender Agency was to "reliev[e] the legal profession of this unique burden", while at the same time creating a public agency that would provide "more efficient" and "more uniform" representation to indigent defendants — representation that would be provided by "highly skilled and specialized" lawyers whose services would be "comparable to the services of the district attorney's offices." [18]

---

[16]  *DeLisio v. Superior Court*, 740 P.2d 437 (Alaska 1987).

[17]  House Judiciary Committee Report on Committee Substitute for House Bill No. 127 (Judiciary).

[18]  1969 House Journal at 220.

Thus, the Public Defender Agency was created to meet the State's constitutional obligation under *Gideon v. Wainwright* to provide legal counsel to indigent criminal defendants. With this legislative purpose in mind, we turn to an analysis of the statutory language at issue in this case.

*A closer look at the Public Defender Act*

Within the Public Defender Act, the statutory guarantee of legal counsel for indigent criminal defendants is found in AS 18.85.100(a). Subsection (a)(1) of this statute speaks of an indigent defendant's right "to be represented ... by an attorney to the same extent as a person retaining [a private] attorney", while subsection (a)(2) of the statute speaks of a defendant's right "to be provided with the necessary services and facilities of this representation".

The fact that subsection (a)(2) speaks of "the necessary services and facilities of *this representation*" is an important factor in construing the statute.

As we explained in the preceding section of this opinion, the legislative purpose behind the Public Defender Act was to create a mechanism for meeting the State's obligation under *Gideon v. Wainwright* to provide legal counsel to indigent criminal defendants. Subsection (a)(1) of AS 18.85.100 addresses this obligation directly — by declaring that indigent defendants have a right of representation "to the same extent as a person retaining [a private] attorney".

Subsection (a)(2) of the statute speaks of the other services and facilities that are necessary to "this representation". Given the underlying purpose of the Public Defender Act, it makes sense to interpret the phrase "this representation" as a reference to the representation by counsel guaranteed by subsection (a)(1). The legislature's reference to "this representation" suggests that the legislature viewed such things as

clerical support, investigative services, and consultation with experts as *ancillary* services that might be needed if indigent defendants were to receive the full benefit of the legal representation guaranteed by subsection (a)(1).

Under this interpretation of the statute, the Public Defender Agency would only be obligated to provide these ancillary services to defendants who are represented by the Agency (or by attorneys working under contract with the Agency).

We acknowledge that the courts of other states are split on this issue. [19] Some states have held that their public defender agencies have an independent

---

[19] *See People v. Cardenas*, 62 P.3d 621, 623 (Colo. 2002) (holding that a defendant who wanted the state to pay for a private translator was required to accept representation by court-appointed counsel); *DeFries v. State*, 597 So.2d 742, 744-46 (Ala. Crim. App. 1992) (holding that a defendant who wanted public funds to hire a private investigator was required to accept court-appointed counsel).

*But see Matter of Cannady*, 600 A.2d 459, 462 (N.J. 1991) (holding that an indigent defendant whose family supplied the money for a private attorney was still entitled to have the public defender agency pay for an expert witness — but at the same time giving the public defender agency the same discretion it would normally enjoy to decide whether the proposed expert was important enough to justify the expense); *State v. Burns*, 4 P.3d 795, 800-01 (Utah 2000) (same holding); *State v. Wool*, 648 A.2d 655, 658, 660 (Vt. 1994) (interpreting Vermont's Public Defender Act to require the agency to pay for an indigent defendant's investigative and expert witness services even when the defendant does not accept court-appointed counsel); *Morton v. Commonwealth*, 817 S.W.2d 218, 220-21 (Ky. 1991) (stating in *dicta* that a defendant represented by a private *pro bono* attorney might be entitled to have the public defender agency pay such additional expenses as expert testing and witness fees).

*See also State v. Brown*, 134 P.3d 753, 756, 760 (N.M. 2006) (holding, as a matter of state constitutional law, that an indigent defendant who was represented by private *pro bono* counsel was entitled to have the public defender agency pay the fees for an expert witness — and that the fact that the New Mexico Legislature had failed to set aside a budget appropriation for this purpose did not prevent the courts from taking action to obtain the funding necessary to protect these defendants' rights).

duty to provide these other services to *all* defendants who can not afford them — regardless of whether those defendants are represented by retained private attorneys, or by private attorneys working *pro bono*, or whether the defendants are representing themselves. But we also note that, for the most part, the applicable statutes of those states are worded differently from Alaska's.

We also acknowledge that our Public Defender Act defines "indigent person" as someone who "does not have sufficient assets, credit, or other means to provide for payment of an attorney and all other necessary expenses of representation". AS 18.85.170(4). Thus, a criminal defendant who has sufficient assets to pay a private attorney's retainer might still qualify for representation by the Public Defender Agency (or the Office of Public Advocacy) if the case involves significant "other necessary expenses" that the defendant can not afford.

But it does not follow that a defendant in this situation can retain a private attorney and then demand that the Public Defender Agency provide the funding for the other necessary "services and facilities" of the private attorney's representation. Rather, the need for these services, and their projected cost, is part of the calculation of whether the defendant is "indigent" — *i.e.*, whether the defendant is entitled to demand legal representation at public expense.

This matter is clarified in Alaska Criminal Rule 39.1. Under this rule, when a court assesses whether a defendant is indigent (and thus eligible for counsel at public expense), the court is directed to evaluate the defendant's assets against the table of "likely cost[s] of private representation" set forth in Rule 39.1(d)(1). But subsection (d)(2)(C) of the rule authorizes a court to adjust these "likely costs" upward if the case "has special characteristics that are likely to increase the cost of private representation, such as the need for expert witnesses, special investigations, or expensive tests".

Thus, the likelihood of these additional expenses authorizes the court to relax the financial test for appointment of counsel at public expense. But it does not authorize the court to let the defendant retain private counsel and then order the Public Defender Agency to reimburse the defendant's retained private attorney for these additional expenses.

*Crawford's arguments based on policy*

Mr. Andrew Steiner (the attorney who, at this Court's request, is arguing Crawford's position) contends that there are policy reasons to construe AS 18.85.100(a) as granting indigent defendants the separate, severable rights to (1) public funding of their defense attorney and (2) public funding of clerical, investigative, and expert support services necessary to the litigation. Under this proposed interpretation of the statute, even if an indigent defendant declines legal representation at public expense, the defendant would still be entitled to public funding of whatever support services were required for the litigation of the defendant's case.

This proposal has the least force, and leads to the most dubious consequences, in instances where a defendant qualifies as "indigent" under AS 18.85.170(4), not because they are unable to pay a private attorney's retainer, but because they are unable to afford the additional expense of the investigative and expert services described in AS 18.85.100(a)(2).

In such instances, if AS 18.85.100(a) were interpreted as Mr. Steiner suggests, the Public Defender Agency would be required to supply support services to defendants who were represented by private counsel (or the Agency would have to pay a third party to supply these services).

We think it is unlikely that the Alaska legislature intended this result. As the Kentucky Supreme Court observed in *Morton v. Commonwealth*, 817 S.W.2d 218, 220 (Ky. 1991):

> [The public defender act] is a unified enactment which contemplates the necessity of a comprehensive determination whether a defendant qualifies for the benefits provided. ... The statute surely does not contemplate that a defendant would be indigent for purposes of [the statute] but still able to hire an attorney. If such were the case, rarely would any defendant step forward to pay investigative costs and other services necessary for his representation. ... Under [the act], inability to obtain counsel and inability to obtain necessary services must go hand-in-hand.

We acknowledge that Mr. Steiner's argument has more force in instances where an indigent defendant is represented by a private attorney who is working *pro bono publico* (that is, without expectation of payment), or in instances where an indigent defendant has waived their right to counsel and is proceeding *pro se*. In such cases, a defendant is asking less of the Public Defender Agency than the defendant would otherwise be entitled to — forgoing their right to legal counsel at public expense, and seeking public funds only for clerical, investigative, or expert services.

But as the Public Defender Agency points out in their *amicus* brief, if AS 18.85.100(a) were interpreted in this fashion, it would frequently place the Agency in an adversarial relationship with the defendant, and these conflicts between the Agency and the defendant might often lead to interlocutory litigation.

AS 18.85.100(a)(2) obligates the Public Defender Agency to supply the "*necessary* services and facilities" of a defendant's representation. Presumably, before the Public Defender Agency agreed to spend its funds for investigative or expert services requested by a defendant, the Agency would wish to determine for itself whether those

requested services were necessary to the litigation of the defendant's case — in the same way the Agency makes this assessment when the Agency itself is representing a defendant.

In many (if not most) instances, this would require the Agency to study the evidence in the case, evaluate the State's theory of prosecution, and assess the potential available defenses — in other words, learn and analyze the defendant's case as if the Agency *were* the defendant's attorney. This would almost always mean that the defendant would have to reveal attorney-client confidences to the Agency — or, if the defendant was *pro se*, the defendant would have to reveal equivalent confidences to the Agency — even though the Agency was not representing the defendant.

Moreover, if the Agency disagreed with the defendant about whether it was necessary to spend money for the investigative services or expert consultations that the defendant was requesting, the defendant (as a practical matter) would have to immediately challenge the Agency's decision — first in an application to the trial judge, and then (if the defendant was unsuccessful) in an interlocutory petition to this Court.

Again, we think it is unlikely that the Alaska legislature intended or envisioned this result when the legislature enacted AS 18.85.100(a).

In light of all the foregoing, we conclude that the legislature viewed the support services described in AS 18.85.100(a)(2) as ancillary to the right of legal representation described in AS 18.85.100(a)(1). Thus, the Public Defender Agency's obligation to provide the services described in subsection (a)(2) arises from, and hinges on, the fact that the Agency is providing legal representation to a defendant. If an indigent defendant declines counsel at public expense and chooses to proceed *pro se*, the defendant also declines the ancillary support services described in AS 18.85.-100(a)(2).

*The argument that Alaska Administrative Rule 12(e) authorizes the court
to provide public funds for these support services*

Mr. Steiner contends that even if AS 18.85.100(a) is interpreted in this fashion, Alaska Administrative Rule 12(e)(1) independently authorizes a court to order public funding for clerical, investigative, and expert services when an indigent defendant waives the right to counsel at public expense and is therefore not eligible to have these services provided at public expense under AS 18.85.100(a)(2).

The two *amicus curiae* defense agencies — the Public Defender Agency and the Office of Public Advocacy — agree with Mr. Steiner that Administrative Rule 12(e)(1) authorizes a court to order public funding of these support services. But for the reasons we are about to explain, we disagree with this interpretation of Administrative Rule 12(e)(1).

Administrative Rule 12(e)(1) reads:

> *Constitutionally Required Appointments.* If the court determines that counsel, or a guardian ad litem, or other representative should be appointed for an indigent person, and [if the court] further determines that the appointment is not authorized by AS 18.85.100(a) or AS 44.21.410 [the Office of Public Advocacy's counterpart to AS 18.85.100(a)], but in the opinion of the court [the appointment] is required by law or rule, the court shall appoint an attorney who is a member of the Alaska Bar Association to provide the required services. Other persons may be appointed to provide required services to the extent permissible by law.

The first sentence of this rule clearly does not encompass the appointment of clerical staff, investigators, or experts. That first sentence is expressly limited to the appointment of "counsel, or a guardian ad litem, or other representative" for an indigent

person — and then, only if the appointment is required by law, and only if the appointment is not authorized by AS 18.85.100(a) or the Office of Public Advocacy's counterpart statute, AS 44.21.410.

Mr. Steiner and the two defense agencies suggest that the *second* sentence of Administrative Rule 12(e)(1) authorizes a court to appoint clerical staff, investigators, or experts at public expense. This sentence reads, "Other persons may be appointed to provide required services to the extent permissible by law."

But we must not take this sentence out of context. The phrase "required services" occurs twice in Administrative Rule 12(e)(1). The phrase appears for the first time at the end of the first sentence of the rule: "... the court shall appoint an attorney who is a member of the Alaska Bar Association *to provide the required services*."

Here, the phrase "required services" plainly refers to the services described earlier in that same sentence — *i.e.*, the services of "counsel, or a guardian ad litem, or other representative [of] an indigent person" in cases where the court concludes that (1) the appointment is not authorized by the Public Defender statute, but nevertheless (2) the appointment of a representative "*is required by law or rule*". (Emphasis added.)

Thus, when the supreme court used this same phrase again in the very next sentence of the rule ("Other persons may be appointed to provide required services to the extent permissible by law."), the supreme court presumably intended the phrase to mean the same thing — *i.e.*, a reference to the services of a *representative* ("counsel, guardian ad litem, or other representative") that the court considers to be "required by law or rule".

This interpretation of the second sentence of Administrative Rule 12(e)(1) is supported by the legislative history of the rule. This legislative history shows that the second sentence of the rule was intended to expand a court's authority of appointment under the *first* sentence of the rule — by allowing the court to appoint someone *other* than an attorney to be a person's "guardian ad litem or other representative" when the

court believes that the appointment of a guardian or other representative is required by law or rule.

Supreme Court Order No. 676 (effective April 25, 1986) enacted Administrative Rule 12(e) in its present form. Prior to Supreme Court Order No. 676, the rule made no mention of "other persons" or "other representative[s]". It only spoke of the appointment of counsel and guardians ad litem. [20]

The rule was revised because, in September 1985, Fairbanks Standing Master Carol Davis wrote memoranda to Court Administration in which she expressed concern that there were "several areas of the law ... where there is a need ... for the appointment of an attorney or guardian ad litem", but where the appointment would not be authorized by the statutes governing the Office of Public Advocacy. According to Ms. Davis, those areas included appointments of an attorney or guardian ad litem for minor children (and potentially for indigent parents or other child custodians) in guardianship proceedings, as well as appointments for the respondent in a protective proceeding and for children or incompetent adults in probate proceedings. [21]

Responding to Ms. Davis's concerns, the deputy administrative director of the Alaska Court System (Stephanie J. Cole) conceded that the law, as it currently stood, did not appear to allow the Office of Public Advocacy to make an appointment in these circumstances. Ms. Cole concluded that a court would probably be required to appoint a private attorney in these instances. [22]

---

[20] *See* Supreme Court Order No. 652 (effective July 1, 1985).

[21] Memoranda of Carol Davis dated September 11 & 24, 1985 (contained in the Alaska Court Rules Attorney's legislative file on Administrative Rule 12(e)).

[22] Memorandum of Stephanie J. Cole dated October 8, 1985 (contained in the Court Rules Attorney's legislative file).

In January 1986, Ms. Cole issued a memorandum that contained a proposed new version of Administrative Rule 12 to deal with this problem. Ms. Cole's proposal for Rule 12(e) is essentially a *verbatim* version of the current rule. The only difference is that the second sentence of Ms. Cole's 1986 proposal used the phrase "non-attorneys", while the second sentence of the enacted version of Rule 12(e) uses the phrase "other persons". [23]

In April, following the supreme court conference at which Ms. Cole's proposal was discussed (and adopted almost *verbatim*), the general counsel for the Court System, attorney Karla L. Forsythe, wrote a memorandum describing the purpose of the new Administrative Rule 12(e). In her memorandum, Ms. Forsythe stated that the new rule "clarifies the circumstances in which persons entitled to representation at public expense will be *represented by counsel or other persons* appointed and compensated by the court rather than by the public defender or the office of public advocacy." [24] (Emphasis added.)

This legislative history shows that the second sentence of Administrative Rule 12(e) was meant to modify and enhance the power of appointment described in the first sentence of the rule. The first sentence authorizes a court to appoint someone to serve as an indigent person's *representative* — either as their "counsel", or as their "guardian ad litem", or in some "other representative" capacity. The second sentence of the rule was intended to expand the pool of people who might be appointed to serve in this representative capacity — not just attorneys, but "other persons".

---

[23] Memorandum of Stephanie J. Cole dated January 23, 1986 (contained in the Court Rules Attorney's legislative file).

[24] Memorandum of Karla L. Forsythe dated April 7, 1986 (contained in the Court Rules Attorney's legislative file).

2566

For these reasons, we reject the suggestion that the second sentence of Administrative Rule 12(e)(1) was intended to give courts the authority to appoint people to provide clerical services, investigative services, or expert services to indigent criminal defendants at public expense.

We acknowledge that subsection (e)(5) of Administrative Rule 12 ("Compensation") speaks of compensation for "necessary interpreter services", "investigation", "expert witnesses", and "necessary travel and per diem". *See* Rule 12(e)(5)(E). But given the overall context of Administrative Rule 12(e), it seems clear that the "compensation" addressed in subsection (e)(5) is the compensation to be paid to the *representatives* appointed under subsection (e)(1) of the rule.

Under subsection (e)(5)(E), those representatives can apply for reimbursement of the expenses they have incurred for "necessary interpreter services", "investigation", "expert witnesses", and "necessary travel and per diem". But there is no indication that subsection (e)(5)(E) was intended to authorize a trial court to independently appoint investigators or expert witnesses for indigent litigants (both civil and criminal litigants) when no representative has been appointed for the litigant under subsection (e)(1) of the rule.

We therefore conclude that subsection (e)(5)(E) of Administrative Rule 12 was not intended to give a court independent authority to hire investigators and experts for indigent defendants who have waived their right to court-appointed counsel.

*The two questions that we leave unanswered*

Because Crawford never made the threshold showing required by *Ake* and *Caldwell*, we need not decide what the law would have required if he had made this

showing. As we indicated at the beginning of this opinion, this means that there are two significant issues that we leave unanswered.

The first question is whether it is constitutional for Alaska to require indigent defendants who want clerical, investigative, or expert litigation support services to accept legal representation through the Public Defender Agency or the Office of Public Advocacy as a pre-condition of receiving these support services at public expense.

And if it is *not* constitutional to require indigent defendants in this situation to accept legal representation through the Public Defender Agency or the Office of Public Advocacy in order to receive public funding for clerical support, investigative services, and expert evaluations and testimony, then a second question arises: What is the mechanism by which the State of Alaska will provide funding for necessary litigation support services under *Ake v. Oklahoma* when an indigent defendant rejects legal representation at public expense?

When we called for supplemental briefing in Crawford's appeal, we anticipated that we would address these issues. But because Crawford's case can be resolved without reaching these issues, we conclude that it is wiser to abstain from deciding them. [25] We say this because, in large measure, the solution to these problems is a political matter that should be addressed by the legislature. We believe that we should not address these questions further until the legislature has had an opportunity to consider them and to take action.

---

[25] *See Perry v. State*, 429 P.2d 249, 251-52 (Alaska 1967) (declaring that a court should not pass on a constitutional issue unless the determination of that issue is essential to the court's decision of the case); *Robins v. Anchorage*, 711 P.2d 550, 552 (Alaska App. 1985) (declining to reach a constitutional issue because the facts of the case provided an alternative basis for deciding the case).

*Conclusion*

The judgement of the superior court is AFFIRMED.