2021 IL App (1st) 190889-U

No. 1-19-0889

Order filed September 21, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 2016 CR 15663 |
| | ) | |
| WILLIAM QUESADA, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to sustain defendant's conviction for aggravated battery of a child, but remand was necessary for the trial court to conduct a preliminary inquiry into defendant's *pro se* ineffective assistance of counsel claim, rendering it premature to consider the ineffective assistance of counsel claim raised by counsel on appeal.

¶ 2    Following a bench trial, defendant William Quesada was found guilty of the aggravated battery of 21-month-old L.M. On appeal, defendant asserts that (1) the evidence was insufficient to sustain his conviction, (2) trial counsel was ineffective for failing to present expert testimony and cross-examine the State's expert with contrary medical literature, and (3) the trial court

failed to make a preliminary inquiry into his *pro se* ineffective assistance of counsel claim. We find the evidence was sufficient to sustain defendant's conviction. We agree, however, that the trial court failed to conduct a preliminary inquiry into defendant's *pro se* ineffective assistance of counsel claim. Because we must remand this matter for a proper inquiry, it would be premature to address the ineffective assistance of counsel claim raised by appellate counsel.

¶ 3                                I. Background

¶ 4      In July 2016, L.M.'s mother, Diana Camarillo, left him with her sister, Barbara Quesada, and defendant, Barbara's husband.[1] The couple had two children: three-year-old N.Q. and five-year-old W.Q. The Quesadas were to care for L.M. while Camarillo sorted out her affairs. Just after 2 p.m. on August 26, 2016, L.M. became unresponsive and was taken to the hospital. It is undisputed that Barbara had left for work at Dunkin' Donuts shortly before, and that L.M. was at home with his two cousins and defendant. At the hospital, tests showed that L.M. had suffered serious, permanent brain damage. The charges alleged that defendant knowingly caused great bodily harm to L.M. by shaking him. The defense suggested, however, that L.M.'s injuries could have been caused by a preexisting condition, the paramedics or Barbara, who was initially arrested and investigated alongside defendant as a possible suspect.

¶ 5      At trial, defendant was represented by private counsel: Edward Johnson and Mark Galler. Before trial, Johnson told the court that defendant needed an expert to rebut the State's expert, but Johnson was not sure whether defendant could afford it. Johnson later informed the court that the defense was still trying to obtain an expert witness. Ultimately, no expert witness appeared on defendant's behalf.

---

[1]Multiple spellings for the name of L.M.'s mother appear in the record.

¶ 6    At trial, Lieutenant Cummings, an EMT, testified that he and several others responded to a call of a child not breathing on the second floor of 4335 South Wood Street. There, he encountered a lifeless child on the floor with a substance on his upper body. L.M. wore a diaper and was cold to the touch. When asked if "first aid" was administered, defendant answered no. CPR was initially unsuccessful but once L.M. began breathing, Lieutenant Cummings carried him downstairs to an ambulance. At that time, "some contents" came out of L.M.'s mouth. CPR continued inside the ambulance.

¶ 7    Lieutenant Cummings returned to the apartment and questioned defendant, who initially did not explain what had happened. The lieutenant observed that the bathtub was half full. "I believe he said he was giving the kid a bath and did he keep going under water and then, it was no." Defendant said at one point that one of his children may have been rough with L.M. According to Lieutenant Cummings, defendant did not seem distraught. The lieutenant did not talk to defendant's children, who "seemed stunned at best."

¶ 8    Paramedic Craig Larson testified that at the scene, L.M. was wet, blue, unresponsive and wearing a dry diaper. When L.M. was intubated on the way to the hospital, water came out of the tube. Daniel DeVito also testified that L.M. was wet and added that Barbara rode in the ambulance. The parties stipulated that Officer Tencza would testify that when he responded to the scene, the victim was dry. Additionally, Officer Tencza's bodycam footage was played in open court, as was the bodycam footage of several other officers.

¶ 9    That footage showed that defendant did not know L.M.'s name, or at least his legal name, and claimed that the water in the bathtub was old. Defendant said that after L.M. made a bowel movement, defendant used the spray nozzle to clean L.M., rather than placing him in the bathtub. Outside the ambulance, Officer Tencza asked, "Is the baby wet at all?" Someone inside answered

no. Officer Tencza then suggested that defendant may have dried L.M. off before their arrival. Moreover, defendant stated that he had performed CPR, that one of his children "roughed up"" L.M. and that L.M. may have had a seizure.

¶ 10    Before Barbara's testimony, defense attorney Johnson informed the court of his prior attorney-client relationship with Barbara in a related child custody matter.[2] Johnson and Barbara had discussed things related to defendant's case. The court found that everyone was "trying to do the right thing" but recognized that "[h]ad this been known earlier, we could have entertained motions about remedies sooner whether Mr. Johnson should be available or not to represent [defendant]." With defendant's agreement, the court determined that Galler, who had never communicated with Barbara, could handle her cross-examination.

¶ 11    Barbara, age 27, testified that in July 2016, she was living with defendant and their two sons. She agreed to take care of L.M. for a short period because Camarillo needed to get a job and "was a little bit too much into partying." Defendant "wasn't feeling too good about" the arrangement, however, because he did not believe Camarillo was going to seek employment. Barbara also acknowledged that she thought Camarillo, who used drugs and alcohol during her pregnancy, was not taking proper care of L.M. While Camarillo had never had a child removed from her, Barbara had, due to drug use.

¶ 12    When L.M. arrived to stay with them, he had a diaper, a car seat and a bag full of clothes that did not fit him. Barbara denied that he had cigarette burns. In addition, L.M. could not talk, walk or eat solid foods, and Barbara helped him learn to eat. Furthermore, L.M. spent much of the day in his bouncer and had very little interaction with his cousins.

---

[2]Defendant's children became the subject of neglect proceedings due to this criminal case.

¶ 13    On the Wednesday night before this incident, Barbara heard L.M. gagging in his crib and woke defendant up to check on L.M. Defendant determined that L.M. was fine and put him in the bouncer next to them in the living room, where the whole family had been sleeping. The next day, L.M. was more sleepy than usual, vomited and did not drink or eat, Barbara did not seek medical attention and L.M. seemed better the following morning. L.M. ate some banana and drank apple juice without vomiting.

¶ 14    At about 1:30 p.m., Barbara left for work, although it was only a 5-to-10-minute walk and she did not need to be there until 2 p.m.[3] Before she left, she observed that L.M. was watching television in his bouncer and did not appear to be in distress. She denied that she violently shook L.M. or submerged him in water and testified that she did not see her son push L.M. to the ground. Barbara further testified that her family had a history of seizures and Camarillo had a stroke as a baby.

¶ 15    The testimony of Fatima Mariballa, Barbara's manager, confirmed that Barbara clocked in between 1:45 p.m. and 2 p.m. and clocked out between 2 p.m. and 2:15 p.m. According to Barbara, defendant called about 15 minutes after she arrived at work and said that something was wrong with L.M. When Barbara arrived home, she went straight to the ambulance. On the way to the hospital, she called Camarillo.

¶ 16    At the hospital, Dr. Jill Glick shared her conclusion that L.M.'s injuries were caused by being shaken. Barbara also learned at the hospital that L.M. was supposed to have been taking asthma medicine, which Camarillo had apparently not provided because she could not afford it. When Barbara subsequently spoke to Claudia Gutierrez with the Department of Children and

---

[3]The parties stipulated that it would have taken Barbara seven minutes to walk to work.

Family Services, Barbara said that defendant could not have hurt L.M. because defendant loved him. The doctors' opinions changed her mind, however.

¶ 17     Dr. Glick, a professor of pediatrics for the University of Chicago and the medical director of the Child Advocacy and Protective Services team, testified that she, and other doctors, examined L.M. at the hospital. She also reviewed L.M.'s medical records and various reports. Those records showed that paramedics were dispatched to L.M.'s home at 2:06 p.m., arrived there at 2:10 p.m. and arrived at Comer Children's Hospital at 2:33 p.m. The paramedics tried to resuscitate L.M. for about 17 minutes and followed advanced life-saving protocol. After L.M. arrived at the emergency room, his heart was able to beat on its own again, but he had been without a heart rate of his own for approximately 40 minutes and was in a coma. Dr. Glick determined that L.M.'s injuries were not related to the paramedics' activities.

¶ 18     Dr. Glick learned that when paramedics intubated L.M., water came out of the endotracheal tube. In addition, two doctors reported that L.M. displayed no evidence of pulmonary disease or acute respiratory distress. The doctors agreed that water was in L.M.'s lungs due to submersion in water, although no one had reported to social workers or staff that submersion had occurred. Dr. Glick explained that the water could not have entered L.M.'s lungs while he was awake, breathing and conscious because his gag reflex would have pushed the water out.

¶ 19     According to Dr. Glick, L.M.'s brain imaging showed global signs of stroke or infarct injury due to a lack of oxygen. He had subarachnoid and subdural bleeding in the posterior aspects. While the initial CT scan did not show herniation, which occurs when the brain swells and pushes through incorrect places, L.M.'s brain began to swell over the next 72 hours. The imaging of L.M.'s eyeballs showed hemorrhages in multiple layers of the retina, which was

"specific to one force or etiology, which is cranial rotational injury." She explained that this was seen following high-velocity car accidents or violent shaking. "Anybody witnessing it would know that would injure someone." L.M. did not have a neck injury, however. Given L.M.'s medical history, she diagnosed him with abusive head trauma and concluded that his prognosis was "very grim," as he had lost the normal architecture of his brain. He could maintain a heart rate but could not breath on his own. He would never walk, crawl, drink a bottle or eat bananas again.

¶ 20    Dr. Glick testified that while L.M. was reportedly sick a couple days prior, he was able to consume nourishment without difficulty on the morning of this incident, which a child with a significant brain injury could not have done. Specifically, "you don't look better in the next 5 minutes or 20 minutes or 3 hours. You will persistently stay ill for a period of time." Upon the court's inquiry, Dr. Glick testified that L.M. would have been symptomatic and unable to take a bottle immediately after the event causing his brain damage. Although Dr. Glick could not determine an exact time of injury through examination alone, L.M.'s condition that morning showed he must have experienced cardiac arrest shortly before emergency services were called, after Barbara left for work. Dr. Glick could not state that with certainty but could state that within a reasonable degree of medical certainty.

¶ 21    As to potential alternative causes, Dr. Glick testified that no one reported that L.M. had suffered from prior seizures. Without going through her notes, however, she did not know if anyone mentioned a family history of seizures. L.M. had seizures once he was at the hospital, but this could be caused by head trauma and brain injury. In any event, a seizure would not have caused L.M.'s injuries. If a seizure were to last more than 40 minutes, a patient could have problems with oxygenation to the brain, but that would not cause eye hemorrhaging.

¶ 22     Dr. Glick acknowledged concerns of medical neglect by Camarillo. She learned that L.M.'s mother consumed cocaine when pregnant, creating a high risk of neurodevelopment delay, and his primary care records reflected delayed speech and motor ability. L.M. had also missed immunizations. Following an emergency room visit for wheezing, L.M. was prescribed an inhaler but his mother did not fill that prescription. Dr. Glick further questioned whether L.M.'s diet was appropriate. Yet, she did not find these things would have caused L.M.'s injuries. Moreover, it was extremely rare for children the age of L.M.'s cousins to inflict this kind of injury and L.M. could not have done it by banging his head against something or falling.

¶ 23     The parties stipulated that Dr. Jamie Braverman, an expert in ophthalmology but not in child abuse pediatrics, would testify that she was unable to determine the age of L.M.'s retinal hemorrhaging but she diagnosed L.M. with multi-layered bilateral retinal hemorrhaging, which was found with abusive head trauma.

¶ 24     Gutierrez, a child protection specialist for DCFS, testified that she interviewed defendant and Barbara in their home on August 31, 2016. According to defendant, Barbara woke him up shortly after midnight on August 25, 2016, because L.M. was having difficulty breathing in his playpen. When defendant put his fingers inside of L.M.'s mouth, he was responsive and gagged. They then put him in his bouncer next to their bed. L.M. slept most of the day and did not eat much. The next day, L.M. awoke at about 8:30 a.m. and had a bottle. At noon, they gave him a banana and apple juice. He then took a nap. Defendant believed that L.M. appeared to be doing better and was back to his normal schedule. At about 1:45 p.m., Barbara left for work.

¶ 25     Defendant told Gutierrez that shortly thereafter, he discovered that L.M. had had a bowel movement, took L.M. to the bathroom and used the shower head to rinse his buttock. Defendant never told Gutierrez that he put L.M. inside the bathtub. Subsequently, defendant placed L.M. on

his back on a bed in the living room, where the whole family had been sleeping to be near the home's sole air conditioning unit. When defendant reached for a diaper, he observed that L.M's heart was racing, his back was arched, and he was foaming at the mouth. Defendant called 911. Although Barbara had testified that Wisconsin DCFS had taken a child away from her, Gutierrez testified that she had determined that neither defendant nor Barbara had had a child removed before this incident.

¶ 26    Defendant testified that in July 2016, Camarillo dropped L.M. off to stay with him and Barbara because Camarillo was "really messed up" and was in a relationship with a man who abused L.M. This arrangement was Barbara's idea, but defendant accepted L.M. into their home because he needed love and attention that he had not been getting. Although the arrangement was supposed to be for a short period, defendant became attached to L.M. while caring for him and was starting to love him. L.M. only cried when he was with Barbara, not defendant.

¶ 27    When defendant and W.Q. returned home from running errands on August 24, 2016, L.M. was crying. Barbara said she did not know why and was getting ready for work. At 1 a.m. on August 25, 2016, Barbara woke defendant up and said that L.M. was wheezing. Defendant put L.M. on his lap and stuck his finger in L.M.'s mouth to see if he was choking on anything. Defendant then put L.M. in the bouncer next to him. The next morning, defendant put W.Q.'s pajamas in the bathtub because he wet the bed. The bathtub also contained a mop and dirty water from the day before. That morning, defendant went out and returned to find that L.M. was still in the bouncer and Barbara was getting ready for work. L.M. drank a bottle and was given banana but merely held the food without eating it. Additionally, L.M. was acting normally. At about 1:45 or 1:50 p.m., Barbara left for work.

¶ 28    Defendant took L.M. out of the bouncer and stood him up. N.Q. then pushed him. After helping L.M. up, defendant went to make a bottle and put L.M. back in the bouncer. At about 2 p.m., he determined that L.M. made a bowel movement so he used the sprayer in the bathroom to clean L.M. Defendant did not put L.M. in the bathtub or shake him, however. When defendant was done, he placed L.M. on a bed and grabbed a diaper. As defendant was putting on a new diaper, about 10 minutes after Barbara had left, L.M. started seizing. He arched his back, his hands became stiff, and his heart raced. Defendant, who had never seen L.M. have a seizure prior to this, called 911. Defendant listened to the 911 operator's instructions and did CPR until the paramedics took over. Defendant denied previously saying that he did not do CPR. Furthermore, defendant explained that when asked for L.M.'s legal name, defendant did not know it because he had only known L.M. by his nickname. The parties stipulated that defendant was convicted of domestic battery on November 13, 2013 (13 DV 82685).

¶ 29    The trial court found defendant guilty of all charges, including aggravated battery of a child. Specifically, L.M. was in a normal state when Barbara left for work. Minutes later, while under defendant's care, L.M. was unresponsive and foaming at the mouth. Additionally, testimony that water came out of L.M.'s body "indicates that much more happened than what the defendant said." Furthermore, Dr. Glick had testified that L.M.'s injuries would have happened immediately, with no time between the trauma and the manifestation of injuries. The only explanation was that defendant "did great damage to this child in an act of frustration."

¶ 30    In his motion for a new trial, defendant argued, among other things, that there were reasonable alternative explanations for L.M.'s injuries and that Dr. Glick's testimony was based on flawed science. The motion cited numerous cases and articles in support of defendant's position. The court denied defendant's motion, citing Dr. Glick's testimony that L.M.'s injuries

would have manifested immediately after the trauma. The court, apparently referring to the bodycam footage, also noted that defendant was talking rapidly and pacing around the room after the incident.

¶ 31    At sentencing, defendant said that he had listened to a recording of the 911 call, in which he could be heard giving L.M. CPR. He also noted that Johnson had a "recording of the doctor where she ruled out a [*sic*] that the victim was not drowned." The following colloquy ensued:

"DEFENDANT: "The State's Attorney only put pieces here and there to make it seem like I did something, but I would never hurt him or any of my children. I feel sorry for what happened to him. I pray for him every day. I believe in God. But you just have to believe that I didn't do nothing to him. I'm innocent of this.

THE COURT: Well, I don't believe you're innocent, and --

DEFENDANT: There was just so much not been --

well –

COURT: Your lawyers were pretty thorough. I think you were very well represented. Mr. Galler particularly is a very artful examiner. He's argued your case clearly to me.

THE DEFENDANT: Your Honor, you're correct. Mark did an excellent job. I can't say that about Mr. Johnson because for the whole two years that I was locked up, he never came to see me to talk to me about my case, so he was just set for whatever they had. I needed to explain to him everything in detail so he can argue the fact of what was being said about me, but since he didn't have the things that was being – to cross-examine, that's what really kind of deranged [*sic*] my trial."

Without further inquiry, the trial court sentenced defendant to 10 years in prison for aggravated battery of a child.

¶ 32                                II. Analysis

¶ 33                         I. Sufficiency of the Evidence

¶ 34    On appeal, defendant first asserts that the evidence was insufficient to sustain his conviction. "A person who is at least 18 years of age commits aggravated battery when, in committing a battery, he or she knowingly and without legal justification by any means *** causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years[.]" 720 ILCS 5/12-3.05(b)(1) (West 2016); see also 720 ILCS 5/4-5(b) (West 2016) (stating that "[a] person *** acts knowingly *** when he or she is consciously aware that that result is practically certain to be caused by his conduct"). Due to its nature, aggravated battery of a child is ordinarily demonstrated through circumstantial evidence. *People v. Lind*, 307 Ill. App. 3d 727, 735 (1999).

¶ 35    Defendant asserts that the State failed to prove that defendant caused L.M.'s injuries and caused them intentionally. As a threshold matter, however, we address defendant's reliance on medical literature as well as case law citing such literature. See, *e.g.*, *People v. Nelson*, 2020 IL App (1st) 151960, ¶ 174 (stating that the "scientific underpinnings of the 'shaken baby syndrome' and 'abusive head trauma' diagnoses have been increasingly called into question by a new body of scientific research"); *Cavazos v. Smith*, 565 U.S. 1, 13 (2011) (Ginsburg, J., dissenting) (recognizing an increase in doubt amongst the medical community as to whether shaking alone can fatally injure an infant); *Del Prete v. Thompson*, 10 F. Supp. 3d 907, 956 (N.D. Ill. 2014) (reciting testimony "that an infant victim of head trauma can have a lucid interval after being subjected to head trauma"); see also *People v. Schuit*, 2016 IL App (1st)

150312, ¶¶ 36, 69 (reciting expert's testimony that "retinal hemorrhages can have myriad causes," and that it was doubtful that vigorous shaking alone causes intracranial bleeding and retinal hemorrhages).

¶ 36    This material was not presented at trial. To the extent it was raised in defendant's motion for a new trial, defendant has not challenged the denial of that motion, which presents a distinct legal contention from his challenge to the sufficiency of the evidence. *People v. Rogers*, 264 Ill. App. 3d 740, 749-50 (1992) (setting forth the criteria for procuring a new trial). Additionally, defendant has not shown that it would be appropriate for this court to take judicial notice of a dispute amongst the medical community as to the validity and nuances of abusive head trauma or shaken baby syndrome. *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003) (stating that "[a] reviewing court will not take judicial notice of critical evidentiary material that was not presented to and not considered by the fact finder during its deliberations"); *People v. Moore*, 2015 IL App (1st), 140051, ¶ 20 (recognizing that courts cannot look outside the record in considering the sufficiency of the evidence); see also *Schuit*, 2016 IL App (1st) 150312, ¶¶ 20, 35, 52 (stating that Dr. Glick denied the existence of a dispute in the medical community although other experts for the State acknowledged one).

¶ 37    In deciding whether the State's evidence was sufficient, reviewing courts must determine whether any rational trier of fact, when viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Wise*, 2021 IL 12392, ¶ 27. This is true regardless of whether the evidence was direct or circumstantial. *People v. Swart*, 369 Ill. App. 3d 614, 634 (2006); but see *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 19 (stating that where a conviction rests on circumstantial evidence, the evidence must be "of a conclusive nature that tends to lead to a satisfactory conclusion and

produces a reasonable and moral certainty that the defendant and no one else committed the crime"). Additionally, we defer to the trial court's credibility findings and the reasonable inferences drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. A trier of fact need not disregard inferences that normally flow from the evidence or search out all possible explanations consistent with innocence, raising them to the level of reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 332 (2000). Furthermore, the testimony of a single witness is sufficient to convict if positive and credible. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Thus, we will not set aside a conviction unless the evidence is so improbable, unreasonable or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Wright*, 2017 IL 119561, ¶ 70.

¶ 38    We find the evidence was sufficient to show both that defendant caused L.M.'s injuries and that he did so intentionally.

¶ 39    Defendant and Barbara both testified that when Barbara went to work, L.M. appeared to be in no immediate distress and was at least able to consume a bottle, notwithstanding that he was unwell in preceding days. Just after Barbara left for work, L.M. stopped breathing. He arched his back, his arms were bent, his heart was racing, and he was foaming at the mouth. Dr. Glick subsequently determined that L.M. had sustained extensive brain and retinal damage consistent with abusive head trauma.

¶ 40    Dr. Glick determined that L.M. would have been incapacitated immediately after the trauma was inflicted, although she acknowledged that she could not medically determine when the incident occurred just by examining L.M. and that she depended on L.M.'s history. The trial court found her testimony to be credible. Additionally, defendant was the sole caregiver present at the onset of L.M.'s condition and Dr. Glick did not believe that N.Q. or W.Q. was likely to have done this. Furthermore, Dr. Glick found no preexisting medical condition that would

explain L.M.'s injuries. While defense counsel revealed that Dr. Glick could not say whether she was told that L.M.'s family had a history of seizures, she also testified that seizures would not have caused L.M.'s injuries. Taken together, the evidence supports a reasonable inference that defendant inflicted L.M.'s injuries. See *Swart*, 369 Ill. App. 3d at 635 (finding the circumstantial evidence supported an inference that no one else had the opportunity to commit the crime where an expert testified that the victim would have shown symptoms almost immediately and the victim was in the defendant's care when he lost consciousness).

¶ 41    Dr. Glick's testimony also supports the court's determination that defendant did so intentionally. Specifically, she testified that L.M.'s extensive injuries could only be caused by a high-velocity vehicular collision or violent shaking and that "[a]nybody witnessing it would know that would injure someone." See *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 49 (finding, per the State's experts, that "[t]he severity of the violence necessary to cause the injuries can sustain an inference of knowledge of a strong probability of death or great bodily injury"); *Lind*, 307 Ill. App. 3d at 735 (stating that a great disparity between the size and strength of the victim and the defendant, and the nature of the victim's injuries, may be considered in examining the defendant's mental state). While defendant testified that he did not shake LM., the court found defendant's explanation was incomplete and not credible because it failed to explain why water came from L.M.'s body. Defendant correctly notes that Dr. Glick did not connect water or submersion in water to L.M.'s injuries but the trial court was nonetheless entitled to find the presence of water rendered defendant's incomplete account uncredible. Accordingly, defendant has not demonstrated that the evidence was insufficient to sustain his conviction.

¶ 42                                        II. *Krankel*

¶ 43    Next, we consider defendant's assertion that the trial court failed to conduct a preliminary inquiry into his *pro se* ineffective assistance of counsel claim pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We review this contention *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33.

¶ 44    A defendant's *pro se* allegation that trial counsel is ineffective is governed by *People v. Krankel*, 102 Ill. 2d 181 (1984) and its progeny. *Roddis*, 2020 IL 124352, ¶ 34. When a defendant makes a *pro se* allegation before the trial court that his trial counsel was ineffective, the court must conduct a preliminary inquiry to determine whether to appoint new counsel to argue that trial counsel was ineffective. *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 41. To trigger this duty, a defendant need not do anything more than bring his claim to the trial court's attention: he is not required to allege the factual basis for his claim, to be specific or to expressly allege that trial counsel was ineffective. *Id*. ¶¶ 41, 44-45 (finding the defendant's allegation that his attorney did not consult with him before trial, and that he wanted to testify to his account of events, triggered the trial court's duty to make a *Krankel* inquiry).

¶ 45    During this preliminary inquiry, some interchange between the trial court and trial counsel is usually necessary to determine whether further action is warranted. *People v. Jackson*, 2020 IL 124112, ¶ 110. Additionally, the court may discuss the defendant's *pro se* allegations with the defendant himself. *People v. Jolly*, 2014 IL 117142, ¶ 30. The trial court can also evaluate the defendant's *pro se* allegations based on the court's knowledge of counsel's performance and any facial insufficiencies in the defendant's allegations. *Roddis*, 2020 IL 124352, ¶ 53. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38.

¶ 46    If the trial court's preliminary inquiry shows that the defendant's *pro se* allegations pertain only to matters of trial strategy, the court is not required to appoint new counsel. *People v. Ayers*, 2017 IL 120071, ¶ 11. If the preliminary inquiry into the allegations shows potential neglect of the case, the court should appoint new counsel. *Jackson*, 2020 IL 124112, ¶ 101.

¶ 47    "[T]he primary purpose of the preliminary inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Ayers*, 2017 IL 120071, ¶ 20. More specifically, the preliminary inquiry is intended to ascertain the factual basis underlying the defendant's p*ro se* claim, afford him the opportunity to explain, and allow the trial court to fully consider the claim, potentially limiting issues to be raised on appeal and creating the necessary record for the reviewing court. *Id*. ¶¶ 13, 24. The preliminary inquiry promotes the resolution of ineffective assistance of counsel claims where they are more likely to be efficiently and correctly resolved. *Sherman*, 2020 IL App (1st) 172162, ¶ 43. In short, "the whole point of *Krankel* is that we should *not* kick the can down the road." *People v. Downing*, 2019 IL App (1st)170329, ¶ 41.

¶ 48    The parties dispute whether *Krankel* applies when a defendant has private counsel. In *People v. Pecoraro*, 144 Ill. 2d 1, 14 (1991), the defendant argued that the trial court failed to appoint new counsel to argue his post-trial ineffective assistance of counsel claims. The supreme court found *Krankel* was distinguishable from Pecoraro's case because he had private counsel at all times and never requested that he be represented by different counsel. *Id*. at 14-15.

¶ 49    Following *Pecararo*, the appellate court has been divided as to whether the requirements of *Krankel* apply where a defendant has private counsel. Compare *People v. Mourning*, 2016 IL App (4th) 140270, ¶ 20 (finding no reason to treat defendants represented by private counsel differently under *Krankel*); *People v. Johnson*, 227 Ill.App.3d 800, 810 (1992) (finding that

*Pecoraro* does not stand "for the proposition that a trial court is free to automatically deny a *pro se* request for new counsel simply because the defense counsel who was allegedly ineffective was privately retained"), *People v. Willis*, 2013 IL App (1st) 110233 (applying *Krankel* where the defendant was represented by private counsel), with *People v. Shaw*, 351 Ill.App.3d 1087, 1091-92 (2004) (finding that under *Pecoraro*, the defendant's representation by private counsel precluded his *Krankel* claim). Our supreme court has yet to resolve this dispute. See *People v. Taylor*, 237 Ill. 2d 68, 80 (2010); see also *Taylor*, 237 Ill. 2d at 81 (Burke, J., dissenting) (stating that reading *Pecoraro* to prohibit a *Krankel* inquiry because counsel was privately retained would violate the sixth amendment). We follow the weight of authority holding that *Krankel* applies even where the defendant has private counsel.

¶ 50    During defendant's statement in elocution at sentencing, defendant apparently attempted to inform the court that the evidence presented was incomplete. The court interrupted to compliment defendant's attorneys, Galler in particular. Defendant responded:

> "Your Honor, you're correct. Mark did an excellent job. I can't say that about Mr. Johnson because for the whole two years that I was locked up, he never came to see me to talk to me about my case, so he was just set for whatever they had. I needed to explain to him everything in detail so he can argue the fact of what was being said about me, but since he didn't have the things that was being – to cross-examine, that's what really kind of deranged my trial."

Notwithstanding the State's argument to the contrary, defendant was clearly alleging that Johnson failed to visit him and learn pertinent facts. This was sufficient to trigger the trial court's duty to conduct a preliminary inquiry under *Krankel*. *Cf. People v. Jindra*, 2018 IL App (2d)

160225, ¶ 19 (stating that a *Krankel* inquiry is not required where the defendant's claim is implicit and subject to different interpretations).

¶ 51    The State argues that this did not trigger the court's duty under *Krankel* because defendant's allegations were against only one of two attorneys who represented him. Indeed, defendant acknowledged that Galler did an excellent job. Yet, the State has not explained how Galler's proficiencies would necessarily compensate for Johnson's alleged deficiencies. The State's position would require defendant to rely on Galler or Johnson himself to bring the latter's alleged deficiencies to the court's attention. Accordingly, we are unpersuaded.

¶ 52    Having determined that defendant's comments triggered the trial court's duty to conduct a preliminary inquiry, we also find that the court did not do so. As stated, the trial court can evaluate the defendant's *pro se* allegations based on the court's knowledge of counsel's performance and any facial insufficiencies in the defendant's allegations. *Roddis*, 2020 IL 124352, ¶ 53. Yet, the record does not rebut defendant's assertion that counsel did not meet with him and learn all pertinent facts. Because these allegations are based on matters decidedly outside the record, this was not an appropriate case to rely on the court's knowledge of counsel's conduct. See *Ayers*, 2017 IL 120071, ¶¶ 14-15 (finding that the reviewing court lacked information about the defendant's *pro se* allegations because the circuit court failed to address them and rejecting the State's assertion that the allegations were too bare to trigger a preliminary *Krankel* inquiry); *Mourning*, 2016 IL App (4th) 140270, ¶ 23 (finding that the trial court could not rely solely on its knowledge of defense counsel's performance to reject the defendant's allegations against counsel as being a matters of strategy and that the court failed to uncover the underlying factual basis of the defendant's claim); *Willis*, 2013 IL App (1st) 110233, ¶ 74 (stating that where the defendant's claims against counsel rely on matters outside the record, and

the court failed to conduct an adequate *Krankel* inquiry, the remedy is to remand for the necessary inquiry).

¶ 53     In light of our determination, we must remand this matter for a preliminary inquiry, the result of which could potentially render moot the ineffective assistance of counsel claim raised on appeal. On remand, defendant may develop the record with respect to that claim. See *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 53 (stating that an ineffective assistance of counsel claim based on matters outside the record cannot be brought on direct appeal); see also *People v. Botruff*, 212 Ill. 2d 166, 177 (2004) (recognizing that a defendant is entitled to funds to hire an expert where he demonstrates that the expert's services are crucial to building his defense, that he is financially unable to obtain his own expert and that his inability to do so will prejudice his case); *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 75 (finding that based on available medical literature, trial counsel was ineffective for failing to challenge an expert's opinion that the victim's injuries could only have occurred immediately before his seizure and that no lucid interval could have occurred). To that end, we direct appellate counsel to tender their briefs to trial counsel on remand. See *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37.

¶ 54                              III. Conclusion

¶ 55     The evidence was sufficient to sustain defendant's conviction for aggravated battery of a child under 13 years of age. Additionally, we must remand this matter for a preliminary inquiry into defendant's *pro se* ineffective assistance of counsel claim. We need not consider at this juncture defendant's assertion on appeal that trial counsel was ineffective for failing to counter the State's expert witness.

¶ 56     Affirmed and remanded with directions.