THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD DICKERSON, Defendant-Appellant.

Fourth District   No. 4—91—0708

Opinion filed December 30, 1992.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In January 1991, the State charged defendant, Richard Dickerson, with forgery in that he knowingly *made or altered* a document apparently capable of defrauding another in such a manner that it purports to have been made by another, in violation of section 17—3(a)(1) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 17—3(a)(1)). In April 1991, the trial court granted defendant's motion for a handwriting analysis of the allegedly forged document and ordered that it be performed at the Illinois State crime lab. However, before that analysis occurred, the State asked leave of court to amend its charge from alleging a violation of section 17—3(a)(1) of the Code to alleging a violation of section 17—3(a)(2) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 17—3(a)(2) (*issuing or delivering* a forged document knowing it to have been forged or altered)).

The State's motion sought to delete the allegation that defendant signed the document and asserted instead that defendant had delivered it. At the hearing on that motion, defense counsel did not object to the amendment, but argued that the handwriting analysis was still relevant because the preliminary hearing testimony indicated that the State ascribed both writing and delivering to defendant. The trial

court allowed the amendment and vacated its order for a handwriting analysis. After a July 1991 jury trial, the defendant was convicted of the amended forgery charge. Defendant appeals, arguing that the trial court erroneously impeded his ability to present a defense by vacating the order for a handwriting analysis.

We agree.

## I. FACTS

While driving his auto on February 1, 1988, defendant collided with a parked pickup truck owned by William Brunner, an employee of the Illinois Department of Corrections, and caused $745 in damages to Brunner's truck. Defendant did not have any auto insurance and for two years after the accident did not pay for any damage to the truck. As a result, the Secretary of State suspended defendant's driver's license. On March 1, 1990, defendant visited Brunner's workplace (a Department of Corrections facility) and asked Brunner to sign a release-from-liability form so that defendant could regain his driving privileges. Brunner agreed to do so pursuant to an agreement requiring defendant to pay Brunner a total of $250 in $50 installments due the first of each month. Defendant then paid Brunner $50 for the March installment.

Because of this agreement, defendant regained his driving privileges on March 2, 1990. However, defendant paid only $25 toward the April installment. On April 8, Brunner sent a letter to the Secretary of State stating that defendant had defaulted on the installment agreement. In response, the Secretary of State suspended defendant's driving privileges on April 19, 1990.

On May 17, 1990, a man identifying himself as defendant went to the Secretary of State's office to inquire how he could regain his driving privileges. Linda Williams, an employee at that office, informed this man that he could not enter into another installment agreement because the law allows only one such installment agreement. She informed the man that he could (1) reinstate the first installment agreement if Brunner would inform the Secretary of State that no default occurred, or (2) place $745 as bond to the Secretary of State for the full amount of the damage. Williams could not identify defendant at trial as the man with whom she spoke, explaining that she sees too many people each day to remember each one.

Defendant visited Brunner later that same day (May 17) at Brunner's workplace and asked Brunner to reinstate the first installment agreement. Brunner refused to do so because defendant had not honored the original agreement.

The next day, a man identifying himself as defendant again spoke to Williams at the Secretary of State's office. This man gave Williams a handwritten note on a 5 by 7 yellow sheet of paper that stated the following:

"To Whom it may concern:

An error was not made[.] The previous agreement was not broken. Mr. Dickerson has made payments[.] I regret The Inconvenience [*sic*][.]

Thank You
W.M.G. Brunner
WMG Brunner"

Two signatures—"W.M.G. Brunner" and "WMG Brunner"—appear at the end of the letter in apparently different handwritings. The letter was notarized with a raised notary public seal and writing that reads as follows:

"May 18 1990
Witness to
Signature
Carl A. Otto
Notary Public"

Based on this letter, the Secretary of State reinstated defendant's driving privileges. On May 19, 1990, Brunner received a copy of a letter addressed to defendant informing him that the Secretary of State had reinstated his driving privileges. Brunner thus went to the Secretary of State's office and informed a woman there that he did not sign anything that stated that the default did not occur. When shown a copy of the handwritten letter, Brunner informed the woman that he had not signed it. Brunner also testified at trial that he never signed a letter indicating that the default did not occur. Later, the Secretary of State resuspended defendant's driving privileges.

Michael Hoffman, an investigator for the Secretary of State, investigated this case to determine if defendant had forged the handwritten letter. On November 27, 1990, he phoned all the people listed in the phone book under "Dickerson" until he spoke to a person who identified himself as defendant. For added clarification, Hoffman asked that person if his birthdate was May 11, 1964, and his driver's license number was D26275264135. The person responded that they were. Hoffman then informed that person of everything pertaining to this case and asked "if he had any knowledge of the letter that was sent to the Secretary of State's Office." That person said that he did, and admitted twice that he had signed and sent the handwritten letter to the Secretary of State's office.

Hoffman then set an appointment with that person to meet the next day at the Secretary of State's office. However, no one showed up for the appointment. Hoffman called the same number several times and left messages with other people who answered the phone. He also went to the address listed in the phone book and placed messages on the door. No one responded to these messages.

Approximately two weeks later, in December 1990, Hoffman by coincidence found defendant in a courtroom in the Sangamon County Building. Hoffman was in the courtroom on other business when he heard the name "Richard Dickerson" called by the clerk and saw defendant respond to this call. Hoffman waited for defendant at the courtroom door, and as defendant exited the courtroom, Hoffman stopped him.

To confirm defendant's identity, Hoffman asked him if his birthdate was May 11, 1964, to which defendant responded that it was. Hoffman asked him if he remembered their phone conversation. Defendant told Hoffman that he did. When Hoffman asked defendant again about the letter, defendant again admitted (a third time) that he had signed and sent the handwritten letter to the Secretary of State's office. Hoffman then arranged another meeting with defendant at the residence of defendant's mother, but defendant did not attend.

Based on the above information, the State then charged defendant with forgery. At his initial court appearance on this charge, defendant requested and was granted court-appointed counsel to represent him. At trial, Brunner, Williams, and Hoffman all testified to the above facts. In defendant's case in chief, defendant and his wife both testified that they saw Hoffman in December 1990 in the courtroom when Hoffman asked to arrange to meet with defendant. They both testified that the courtroom was so crowded that people had to stand along the back wall. Defendant testified that he did acknowledge to Hoffman that he remembered their telephone conversation. However, both defendant and his wife testified that Hoffman did not ask defendant for his birthdate, did not mention why he wanted to meet with defendant, and did not mention the handwritten letter. Defendant claimed that he did not even ask Hoffman why he wanted to meet, explaining he had "nothing to hide."

Defendant admitted that he and Hoffman had agreed to meet at the house of defendant's mother, but that he did not go to this meeting because of his odd work schedule. Defendant denied that he visited the Secretary of State's office or spoke with Williams. He also denied admitting to Hoffman that he signed or sent the handwritten

letter. Indeed, he denied ever signing, delivering, or even seeing the handwritten letter until he saw it in court.

In rebuttal, Hoffman clarified that the courtroom in which he saw defendant was empty except for defendant, the judge, and himself. He added that he did not see defendant's wife in the courtroom or in the hallway despite her claim that she stood directly between Hoffman and defendant.

At the end of this trial, the jury convicted defendant of forgery in violation of section 17—3(a)(2) of the Code. The presentence report contained a written statement of defendant's version of events, in which defendant maintained his innocence and wrote that someone with a "personal vendetta" against him had framed him. The trial court sentenced defendant to two years in prison.

## II. ANALYSIS

■ A defendant has the right to present relevant, competent evidence in his defense, and "[the State] must take steps to assure that the [indigent] defendant has a fair opportunity to present his defense." (*Ake v. Oklahoma* (1985), 470 U.S. 68, 76, 84 L. Ed. 2d 53, 61, 105 S. Ct. 1087, 1092.) *Ake* involved the issue of whether the State must pay for a psychiatric evaluation and not a handwriting analysis. However, in *People v. Watson* (1966), 36 Ill. 2d 228, 232, 221 N.E.2d 645, 649, the Illinois Supreme Court (in a context other than a psychiatric evaluation) similarly held that a defendant's indigency cannot be permitted to impede his right to present a defense. Significantly for the present case, the issue the court addressed in *Watson* was whether the indigent defendant should receive a court-appointed handwriting expert to help defendant defend against an attempt (forgery) charge.

In *Watson*, defendant was charged with attempting to forge a stolen traveler's check at a tavern. The owner of the check testified that the defendant had stolen several traveler's checks while hitchhiking with the owner. A bartender at a Rockford tavern identified defendant as the person who attempted to cash one of the traveler's checks at the tavern and who signed it in front of the bartender. Because of differences in the two signatures on the traveler's check, the tavern manager refused to cash it, whereupon the person who presented the traveler's check left the tavern, leaving the check behind.

After defendant's arrest, a second stolen traveler's check from the same group of stolen traveler's checks was forged in front of a drugstore employee and cashed. The defendant thus requested a handwriting expert to compare the signatures on the two checks, in-

tending to argue if the two were the same, then the defendant was not the person who signed the check in front of the bartender at the tavern.

The supreme court held that on these facts, the defendant had a right to receive the funds to pay for a handwriting expert to help him in his defense. In first ruling that the evidence regarding the second check was admissible, the court in *Watson* wrote the following:

> "Even though [defendant] is not charged with signing the check, the facts of the case point out that if he did not sign it, he did not deliver it. A person charged with a crime should be allowed to make all proper defense and if the evidence offered is competent, it should be permitted to go to the jury for all it is worth." (*Watson*, 36 Ill. 2d at 232, 221 N.E.2d at 647-48.)

The court then proceeded to the constitutional issue regarding whether defendant has a right to receive court funds to obtain a handwriting expert to compare the two signatures. The court wrote the following:

> "The court recognizes that there is a distinction between the right to call witnesses and the right to have these witnesses paid for by the government, but in certain instances involving indigents, the lack of funds *** to pay for the witness will often preclude him from calling that witness and occasionally prevent him from offering a defense. Thus, although the defendant is afforded the shadow of the right to call witnesses, he is deprived of the substance.
>
> \* \* \*
>
> *** Here a handwriting expert could give a professional opinion as to whether the defendant signed the check he is accused of attempting to deliver, and could compare the signature on that check with the signature on the check which was signed and delivered while defendant was in custody. If it is his opinion that defendant could not have signed it, then the jury could be permitted to draw the conclusion that defendant is innocent. *Despite the language of the indictment, the issue of handwriting goes to the heart of the defense.* The opinion of a handwriting expert in this case then may have been crucial, and defendant's lack of funds prevented him from presenting to the jury evidence which may have established his innocence. We hold that under the facts presented in this case defendant was entitled to a reasonable fee for the purposes of hiring a [handwriting expert]." (Emphasis added.) *Watson*, 36 Ill. 2d at 233-34, 221 N.E.2d at 648-49.

This case resembles *Watson* in every particular but one: the nexus in the present case between defendant's alleged signing of the note and delivering it to a third party is not as clear as the nexus in *Watson* between the acts of signing and delivering the traveler's check. In *Watson*, the defendant allegedly signed and delivered the traveler's check at the same time; and the same witnesses who saw him sign the traveler's check also saw him deliver it. Thus, proof that the defendant in *Watson* did not sign the check would also necessarily show that he was not the one who delivered it.

█ In the present case, however, evidence that defendant did not sign the note does not negate the State's case; it only weakens it. In particular, the State used the defendant's purported admission that he signed the check as part of the evidence that he knew it was forged. If it turned out that he did not sign it, then the State would need to rely solely on circumstantial evidence to prove knowledge. More importantly, a handwriting analysis concluding that defendant did *not* write the note would bolster defendant's claim that he never admitted to Hoffman that he wrote the note, thereby weakening Hoffman's credibility. The State's argument to the trial court in its motion to reconsider the order granting defendant's motion for a handwriting analysis was clearly wrong in its assertion that "whether or not the defendant personally wrote the document is irrelevant." The fact that such a favorable handwriting analysis would weaken the State's case demonstrates the probativeness of a handwriting analysis. Accordingly, we hold that the trial court erred in vacating its order for a handwriting analysis.

The question remains whether this error constitutes reversible or harmless error. (*People v. Hebel* (1988), 174 Ill. App. 3d 1, 35, 527 N.E.2d 1367, 1389.) "Notwithstanding the occurrence of constitutional error at trial, a criminal conviction may be affirmed if the reviewing court is able to conclude, upon examination of the entire record, that the error was harmless beyond a reasonable doubt." *People v. Howard* (1991), 147 Ill. 2d 103, 148, 588 N.E.2d 1044, 1062.

The record reveals that this case came down to a credibility question between Brunner and Hoffman, on the one hand, and defendant and his wife, on the other. However, defendant's credibility was undermined by the prosecutor's cross-examination of defendant, in which defendant made inconsistent statements and changed his story. Not surprisingly, the jury resolved the credibility question against defendant.

In addition, defendant claimed to have received every letter from the Secretary of State's office except the rather significant April 19

letter informing him that a default had occurred. The Secretary of State sent the letters to his mother's house, but defendant claimed that the April 19 letter "was not brought to my attention." He thus claimed that he could not have attempted to correct a default that he never knew about. We further note that defendant's wife also did not provide the most consistent and compelling testimony.

Nonetheless, we recognize the significant probative value that a handwriting analysis favorable to defendant's case would have on this credibility question. Again, assuming that an analyst testified that defendant did not write or sign the note, Hoffman's insistence that defendant admitted three times that he signed the note would appear fabricated. This impeachment could both seriously hurt Hoffman's credibility and establish a reasonable doubt of defendant's guilt in the eyes of the jury.

Given the record in this case, we hold that if a handwriting analysis by a *bona fide* expert would reveal that defendant did *not* write the note in question, then the trial court committed reversible error in denying defendant the funds for such an analysis. Our conclusion that reversible error occurred expressly depends on the assumption that such an analysis would help defendant as indicated; any finding short of defendant's *not* having written the note would simply be inconclusive and therefore would not provide a sufficient basis for a reversal and retrial. Accordingly, we do not remand this case for a new trial, but instead only for a limited hearing.

Ordinarily, defendant would need to have submitted the names, qualifications, and expenses of suggested handwriting experts for the court's approval, as well as to have established defendant's indigency and inability to finance the analysis. (*Hebel*, 174 Ill. App. 3d at 34, 527 N.E.2d at 1388-89.) Defendant did not do so in his motion for a handwriting analysis. However, the trial court initially granted defendant's motion anyway and ordered that the Illinois State crime lab perform the analysis. The court vacated this order only after the State amended the charge from *signing* to *delivering* a forged document, and its vacating the order was not based on these omissions from defendant's motion. Accordingly, on remand the trial court can require defendant to overcome these deficiencies, if it concludes that such action is necessary.

We remand with instructions that the trial court reinstate its previous order directing the Illinois State crime lab to perform a handwriting analysis. After the analysis has been completed (and if defendant contends the result is favorable, as we have described herein), the trial court should conduct a hearing concerning only the results of the

handwriting analysis. If the expert analyst testifies that he cannot determine whether defendant signed the note (or, obviously, if he testifies that defendant *did* sign the note), then the trial court should again enter judgment on defendant's conviction. If, however, the expert analyst testifies that defendant did *not* sign the note, then the trial court should vacate defendant's conviction and provide defendant with a new trial.

This limited hearing will provide defendant with all of the relief to which he is presently entitled while not burdening the criminal justice system with an unnecessary and expensive new trial. In other words, if defendant cannot present expert handwriting evidence at a retrial that he did *not* write the note in question, there is no reason to provide him a new trial because there is no reason to believe that the evidence would be any different from that presented at his previous trial.

### III. Conclusion

For the reasons stated, we vacate the judgment and remand for further proceedings consistent with the views stated herein.

Vacated with directions.

KNECHT and COOK, JJ., concur.