2023 IL App (1st) 220493-U

No. 1-22-0493

Order filed November 6, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | 2016 CR 15663 |
| WILLIAM QUESADA, | ) ) | The Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court erred by declining to advance defendant's *pro se* allegations against trial counsel to a full *Krankel* hearing where defendant showed possible neglect by counsel.

¶ 2    Following a bench trial, defendant William Quesada was found guilty of the aggravated battery of 21-month-old L.M. On defendant's first direct appeal, we determined that the evidence was sufficient to sustain his conviction, but the trial court failed to conduct a preliminary inquiry into his *pro se* ineffective assistance of counsel claims pursuant to *People v. Krankel*, 102 Ill. 2d

181 (1984). Thus, we remanded this case for a preliminary inquiry without considering the ineffective assistance of counsel claims raised on appeal.

¶ 3    Following that preliminary inquiry, the trial court denied defendant relief. On appeal, he asserts that he demonstrated possible neglect by trial counsel, entitling him to the appointment of new counsel and a full *Krankel* hearing. He also renews the ineffective assistance of counsel claims raised on his first direct appeal. For the following reasons, we remand this matter once more.

¶ 4                                   I. Background

¶ 5                              A. Pretrial Proceedings

¶ 6    In July 2016, L.M. went to live with Barbara Quesada, his biological aunt, and defendant, her husband. The couple's children, three-year-old N.Q. and five-year-old W.Q., also lived with them. On the afternoon of August 26, 2016, Barbara left for work, leaving L.M. at home with his cousins and defendant. Shortly thereafter, L.M. became unresponsive and was taken to the hospital. Tests showed that L.M. had suffered serious, permanent brain damage.

¶ 7    Defendant was charged with aggravated battery of a child in that he knowingly caused great bodily harm to L.M. by shaking him. The State's explanation for L.M.'s injuries rested on the expert testimony of Dr. Jill Glick. The defense's theory, however, was that L.M.'s injuries may have been caused by a preexisting condition, the paramedics or Barbara, who was initially arrested and investigated alongside defendant. Consistent with that theory, Edward Johnson, one of defendant's private attorneys, told the court that defendant needed an expert to rebut the State's expert, but Johnson was not sure that defendant could afford it. Johnson later told the court that the defense was still trying to obtain an expert. Ultimately, the defense did not obtain one.

¶ 8                                         B. Trial

¶ 9      The evidence at trial showed that EMTs and police officers responded to a call of a child

not breathing. The EMTs encountered an unresponsive L.M., lying on the floor of defendant's

apartment with a substance on his upper body. He wore only a diaper, and his body was cold.

Accounts conflicted, however, as to whether L.M.'s body was wet. According to the EMTs,

defendant said he did not administer "first aid." Once the EMTs had L.M. breathing again, he

was carried downstairs and "some contents" came out of his mouth. When L.M. was intubated

on the way to the hospital, water came out of the tube.

¶ 10     Lieutenant Cummings testified that he interviewed defendant inside the apartment and

observed that the bathtub was half full. In addition, defendant said he was giving L.M. a bath but

denied that L.M. kept "going under water." Defendant also told Lieutenant Cummings that one

of his children may have been rough with L.M., although the lieutenant did not to speak to the

children. According to Lieutenant Cummings, defendant did not appear distraught.

¶ 11     The bodycam footage of several officers was admitted into evidence. That footage

collectively showed that defendant did not know L.M.'s legal name and that defendant claimed

the water in the bathtub was old. Defendant also said that after L.M. made a bowel movement,

defendant had used the spray nozzle to clean L.M., rather than placing him in the bathtub.

Defendant further stated that he had performed CPR, that one of his children "roughed up" L.M.

and that L.M. may have had a seizure. Outside the ambulance, Officer Tencza asked whether

L.M. was wet. When someone inside the ambulance answered no, Officer Tencza suggested that

defendant may have dried L.M. off.

¶ 12     The State also presented Barbara's testimony. Beforehand, however, Johnson, defendant's

attorney, informed the court that he had a prior attorney-client relationship with Barbara in a

related child custody matter. Due to this criminal case, the couple's children had become the subject of neglect proceedings. Johnson acknowledged that he had discussed with Barbara things related to defendant's case. In response, the court stated that everyone was "trying to do the right thing," but "[h]ad this been known earlier, we could have entertained motions about remedies sooner whether Mr. Johnson should be available or not to represent [defendant]." With defendant's agreement, the court determined that Mark Galler, Johnson's co-counsel, could cross-examine Barbara, as Galler had never communicated with her.[1]

¶ 13    According to Barbara, she agreed to care for L.M. while his mother, Diana Camarillo, attempted to get a job, but defendant "wasn't feeling too good about" the arrangement because he did not believe she would seek employment. Barbara also believed that Camarillo, who used drugs and alcohol during her pregnancy, was not taking proper care of L.M., although Barbara herself had had a child removed from her care due to drug use.[2] When L.M. came to stay with them, he could not talk, walk or eat solid foods. Barbara helped him learn to eat. Furthermore, L.M. spent much of the day in his bouncer and had very little interaction with his cousins.

¶ 14    Two nights before this incident, Barbara heard L.M. gagging in his crib and had defendant check on him. Defendant did so and determined that L.M. was fine. The next day, L.M. was more tired than usual and vomited. He did not drink or eat. Barbara did not seek medical attention, however, and L.M. seemed better the following morning, the day in question. L.M. ate some banana, and drank apple juice without vomiting. Before leaving for work at about 1:30 p.m., Barbara observed that L.M. did not appear to be in distress. She denied that she

---

[1] It appears that Galler did not represent defendant from the beginning of this case.
[2] Despite this testimony, the Department of Children and Family Services (DCFS) had determined that neither defendant nor Barbara had had a child removed before this incident.

violently shook him or submerged him in water. She further testified that her family had a history of seizures and that L.M.'s mother had had a stroke as a baby.

¶ 15    After L.M. sustained injuries, Dr. Glick told Barbara that his injuries were caused by being shaken. She also learned that L.M. was supposed to have been taking asthma medicine, which his mother had not provided. Moreover, Barbara initially told DCFS that defendant could not have hurt L.M. because defendant loved him, but the doctors' opinions changed her mind.

¶ 16    Dr. Glick, a professor of pediatrics for the University of Chicago and the medical director of the Child Advocacy and Protective Services team, diagnosed L.M. with abusive head trauma. She testified that his brain imaging showed global signs of stroke or infarct injury due to a lack of oxygen. He had subarachnoid and subdural bleeding in the posterior aspects. While the initial CT scan did not show herniation, which occurs when the brain swells and pushes through incorrect places, L.M.'s brain began to swell over the next 72 hours. The imaging of L.M.'s eyeballs showed hemorrhages in multiple layers of the retina, which was "specific to one force or etiology, which is cranial rotational injury." She explained that this was seen following high-velocity car accidents or violent shaking. L.M. did not have a neck injury, however.

¶ 17    Dr. Glick testified that medical records showed the paramedics tried to resuscitate L.M. for about 17 minutes, followed advanced life-saving protocol, and did not cause L.M.'s injuries. Additionally, she learned that when paramedics intubated L.M., water came out of the endotracheal tube. Dr. Glick explained that the water could not have entered L.M.'s lungs while he was awake, breathing and conscious because his gag reflex would have pushed the water out. Thus, she concluded that water was in L.M.'s lungs due to submersion, although no one had reported to social workers or staff that submersion had occurred. We note that Dr. Glick did not

specifically link submersion in water to L.M.'s life threatening injuries or her diagnosis of abusive head trauma.

¶ 18     Dr. Glick further testified that although L.M. was reportedly sick a couple days prior, he was able to consume nourishment on the morning of this incident, which a child with significant brain injury could not have done. Specifically, "you don't look better in the next 5 minutes or 20 minutes or 3 hours. You will persistently stay ill for a period of time." L.M. would have been symptomatic and unable to take a bottle immediately after the event causing his brain damage. Although Dr. Glick could not determine an exact time of injury through examination alone, L.M.'s condition that morning showed he must have experienced cardiac arrest shortly before emergency services were called, after Barbara left for work. Dr. Glick acknowledged that L.M. had seizures at the hospital and that she did not know if anyone mentioned a family history of seizures, but a seizure would not have caused L.M.'s injuries. She similarly testified that his mother's drug use during pregnancy would not have caused his injuries and that it would be extremely rare for children the ages of his cousins to do so.

¶ 19     Dr. Glick concluded that L.M.'s prognosis was "very grim." He had been without a heart rate of his own for about 40 minutes and was in a coma. He would never walk, crawl or drink a bottle again.

¶ 20     The parties stipulated that Dr. Jamie Braverman would testify that L.M. had multi-layered bilateral retinal hemorrhaging, which was found with abusive head trauma. They also stipulated that Dr. Braverman would testify that she could not determine when the hemorrhaging occurred.

¶ 21     Claudia Gutierrez, a child protection specialist for DCFS, testified that defendant said he woke up shortly after midnight on August 25, 2016, because L.M. was having difficulty breathing in his playpen. When defendant put his fingers inside of L.M.'s mouth, he was

responsive and gagged. L.M. slept most of the following day and did not eat much. Defendant said that on the day in question, however, L.M. had a banana and apple juice and appeared to be doing better. Shortly after Barbara left work at about 1:45 p.m., L.M. had a bowel movement. Defendant reported to Gutierrez that he took L.M. to the bathroom and used the shower head to rinse his buttock. According to Gutierrez, defendant never said that he put L.M. inside the bathtub. After defendant had placed L.M. on his back on a bed to put on a diaper, defendant observed that L.M's heart was racing, his back was arched, and he was foaming at the mouth. Defendant called 911.

¶ 22    Defendant testified that at 1 a.m. on August 25, 2016, Barbara woke defendant up and said that L.M. was wheezing. Defendant stuck his finger in L.M.'s mouth to see if he was choking on anything. He apparently was not. On the morning in question, L.M. drank a bottle and was given banana, but merely held the food without eating it. He otherwise behaved normally. After Barbara left for work at about 1:45 or 1:50 p.m., N.Q. pushed L.M. At approximately 2 p.m., L.M. made a bowel movement, and defendant used the sprayer in the bathroom to clean him. Defendant did not, however, put L.M. in the bathtub or shake him. Defendant further explained that he had put W.Q.'s pajamas in the bathtub earlier that day because he had wet the bed. The bathtub also contained a mop and dirty water from the day before.

¶ 23    After defendant placed L.M. on a bed and grabbed a diaper, L.M. started seizing. He arched his back, his hands became stiff, and his heart raced. Defendant called 911 and, per the operator's instructions, performed CPR until the paramedics took over. He denied previously saying that he had not performed CPR. When first responders asked for L.M.'s legal name, defendant did not know it because he had only known L.M. by his nickname. Defendant added

that L.M.'s mother was "really messed up" and in a relationship with a man who abused L.M. Although L.M. was supposed to stay with defendant for only a short period, defendant became attached to L.M. The parties stipulated that defendant was convicted of domestic battery in 2013.

¶ 24    The trial court found defendant guilty of aggravated battery of a child. L.M. was in a normal state when Barbara left for work, but minutes later, while under defendant's care, L.M. became unresponsive. In addition, testimony that water came out of L.M.'s body "indicates that much more happened than what the defendant said." The court also found that Dr. Glick had testified that L.M.'s injuries would have happened immediately, with no time between the trauma and the manifestation of injuries. Thus, the only explanation was that defendant "did great damage to this child in an act of frustration."

¶ 25    Defendant, through Johnson, filed a motion for new trial. During Johnson's cross-examination of Dr. Glick, Johnson had not challenged the medical science behind the conclusion that injuries such as those sustained by L.M. had to have been, or could have been, caused by shaking. In the motion for new trial, however, Johnson cited case law, law review articles, and other journalistic pieces purporting to identify disagreement in the medical community. The motion cited similar materials acknowledging disagreement regarding the period of time that may pass between injuries and the onset of symptoms. Ultimately, the trial court denied defendant's motion and sentenced him to 10 years in prison.

¶ 26                                    C. Direct Appeal

¶ 27    On direct appeal, we found that the evidence was sufficient to sustain defendant's conviction. *People v. Quesada*, 2021 IL App (1st) 190889-U. We also found, however, that defendant had informed the trial court that trial counsel, namely Johnson, failed to meet with him and learn all pertinent facts, triggering the court's duty to conduct a preliminary *Krankel* inquiry.

Because defendant's allegations were based on matters outside the record, the court could not in that instance resolve the allegations solely by relying on its knowledge of counsel's conduct. We remanded the matter for a preliminary *Krankel* inquiry and declined to address defendant's other ineffective assistance of counsel claims, noting that the preliminary inquiry had the potential to render those claims moot.

¶ 28                    D. Preliminary *Krankel* Inquiry

¶ 29    On remand, defendant made detailed allegations against Johnson. He alleged, among other things, that Johnson "failed to retain an expert to either advise him or to testify at trial about the relevant medical evidence" and "failed to petition the Court for funds to hire an expert *** that were necessary to defend against my allegations." Initially, Johnson had said that medical literature showed there was controversy surrounding L.M.'s diagnosis. Johnson showed defendant a book on the matter and said he could obtain a free expert. When defendant followed up on that statement, Johnson "would not give me a straight answer and then said he would need $1,000 to hire an expert." Johnson also failed to cross-examine Dr. Glick with any of the medical literature undermining her opinion. Instead, he first presented the court with such information in an inadequate posttrial motion. Furthermore, Johnson failed to obtain the recording of the 911 call, during which defendant could be heard performing CPR, and failed to obtain a video recorded by the detectives that were first at the scene.

¶ 30    Johnson also labored under a conflict of interest. He presented the defense theory that Barbara could have been responsible for L.M.'s injuries, but had represented her in the related child custody case. When that conflict was disclosed in the middle of trial, defendant agreed to continue with Johnson's representation because no one told him what the other option would have been. Defendant further alleged that Johnson "repeatedly told me that the [trial judge] was

9

his friend and that he would put in a good word with him, with the judge for me when it came to asking for a bond." Although defendant had wanted a jury trial, Johnson " advised me to take a bench trial because once again, he was your friend, the judge's friend."

¶ 31    In response to defendant's comments, the trial court observed that defendant's explanation of L.M.'s injuries had not been consistent with other evidence, but nonetheless directed "Johnson to respond to what was just said, all of it, right now." He did not respond to all of it.

¶ 32    Johnson explained that defendant and Barbara hired him with regard to the DCFS investigation, prior to defendant's arrest. Although defendant could not afford an expert, "[w]e had told him we need an expert to do this case." In addition, he and Galler did not know whether Barbara would be a witness until shortly before trial.[3] Johnson also stated, "I think they agreed to not prosecute her on this case for her testimony. So that -- that was kind of how that conflict arose." In contrast to Johnson's representation at the *Krankel* inquiry, Barbara testified at trial that she had no such agreement with the State. The record is otherwise silent as to whether such an agreement existed and, if so, when Johnson learned of it.

¶ 33    The following colloquy ensued regarding the absence of a defense expert:

> "MR. JOHNSON: [W]e had tried to get money for [defendant] to have an expert. *** Like, there wasn't anything they could afford. He understood that. He had complete knowledge of the whole case and everything we had planned to do thus forth. Like, there were no promises made to him or anything.

---

[3] During discovery, the State informed defense counsel that it "may call as witnesses any person named in the police reports." Those reports listed Barbara as a co-offender. In a pretrial hearing, the State had also represented that Barbara was looked into as a suspect and "could very well be involved as well."

THE COURT: Well, the State did call an expert. They called a doctor if I remember.

\*\*\*

MR. JOHNSON: Yes, Judge, but we couldn't bring our own expert.

THE COURT: No, no, but the doctor was cross-examined about the findings. \*\*\* And I am trying to think if you had retained an expert, if you were able to do that, is there something else you think you could have elicited that was not accomplished on cross-examination of the government's expert?

MR. JOHNSON: Judge, I don't think so. I think maybe it could have brought -- opened some other doors. You know, in this jurisdiction they don't really allow impeaching by treatises, so I don't think, you know, we could have done that either way. But it's always good to have an expert if opposing counsel has an expert."

¶ 34     The following discussion also occurred:

"THE COURT: Well, there is a case. \*\*\* [Y]ou can ask the court even if you are privately retained for funds for an expert. So did you do that in this case? I'm not sure --

MR. JOHNSON: I don't recall, Judge. I don't think so. I think we talked briefly about it but never followed through on that.

THE COURT: But my question again would be that if you had retained an expert, was there something more that you could have gotten from the expert that you were not able to accomplish on the extensive cross-examination you did of the government's expert?

MR. JOHNSON: I don't believe so, Judge."

¶ 35     Defendant disagreed.

11

"DEFENDANT: I believe that he would have been able to do his own [diagnosis] on the child and came up with the conclusion that he was not shook[.] *** Also in shaking babies there's experts that say that the blood vessels in the eyes would have been as it's laying forms [*sic*], you know, and [L.M.], when he got hurt, he had hit the back of his head. That's what I told the police in the beginning. But ever since the doctor said that he had been shook, that -- we -- well, everybody forget all about what I had to say.

*** 

But there is evidence to prove that it's not possible for a child to get shook at that velocity. He would have died[.] *** He fell, hit the back of his head. He went through a seizure. I gave him CPR. That's another thing, on the 911 call the State's attorney played three minutes of it and I was on the phone for 15 minutes and that could be proven.[4]

THE COURT: Yeah. Well, I do remember your testimony. I remember the incident in the bathroom and I remember the incident about whether the clothing of the child was wet or dry.[5]

MR. QUESADA: And that's all false, that's all false, your Honor[.] *** [T]he detectives that first were on the scene, they recorded it themselves with a video camera.

*** 

MR. QUESADA: Why was that never brought into the court?

THE COURT: No, I saw body cam. I saw body cam.

---

[4] Johnson and Galler also told the trial court that an audio recording of the 911 operator guiding defendant through CPR was played at trial. The record on appeal, however, does not contain such a recording or indicate that the recording was presented at trial.

[5] We note that the trial evidence did not affirmatively indicate that the clothing in the bathroom belonged to L.M. In addition, while the defense theory and defendant's testimony had been that L.M. was not in the bathtub, Johnson stated otherwise during the preliminary inquiry. We further note that the evidence conflicted as to whether L.M. was wet or dry and that Dr. Glick did not link L.M.'s submersion in water to her diagnosis of abusive head trauma.

\*\*\*

MR. QUESADA: No, not body cam, your Honor. This was a camcorder from the detective that never showed up[.]"

¶ 36    Galler stated that Johnson's cross-examination of Dr. Glick was "very appropriate given the circumstances." Additionally, Galler believed the evidence presented by the defense or elicited through cross-examination of the State's witnesses covered the defense's theory. He concluded that "the evidence was obviously against [defendant] and that's why the ruling was found against him and he was found ultimately guilty. I don't think that had anything to do with Mr. Johnson's questioning of the expert."

¶ 37    The trial court declined to appoint new counsel to represent defendant at a full *Krankel* hearing. The court found the sole issue that possibly warranted further discussion was the absence of funds for a defense expert. Still, the court was not sure that a defense expert would have changed the result.

"I [think] there was some pretty dramatic issues with [defendant's] version of events and the physical evidence that was found. And I do remember that one of the reasons we spent a long time here was that we had very long, well-prepared cross-examinations by Mr. Johnson and Mr. Galler. \*\*\* There were certainly things that I did not know that I was finding out during the course of the trial which is what is supposed to happen for the trier of fact during the course of a trial. But looking at it now and listening to this, I can't say that I can blame the lawyers[.] \*\*\* [Defendant] got convicted. I think that was a product of the quality of the evidence and presentations heard and basically my rejection of [defendant's] testimony \*\*\* and that's not Mr. Johnson's fault."

¶ 38                                          II. Analysis

13

¶ 39    On appeal, defendant asserts that the trial court erroneously declined to appoint new counsel and advance his *pro se* ineffective assistance of counsel claims to a full *Krankel* hearing. We review the court's judgment for manifest error, which occurs where an error is clearly plain, evident and indisputable. *People v. Alexander*, 2020 IL App (3d) 170829, ¶ 25.

¶ 40                              A. *Krankel* Jurisprudence

¶ 41    The procedure set forth in *Krankel* is triggered when a defendant brings a posttrial *pro se* ineffective assistance of counsel claim to the trial court's attention. *People v. Jackson*, 2020 IL 124112, ¶ 26. The court must first conduct a preliminary inquiry into the basis of this claim. *People v. Ayres*, 2017 IL 120071, ¶ 11. In addition, that inquiry is intended to make the record necessary to review any claim raised on appeal. *People v. Maya*, 2019 IL App (3d) 180275, ¶ 16. This usually requires some interchange between the court and counsel regarding the facts surrounding the defendant's claim, but the court may speak with the defendant as well. *Ayres*, 2017 IL 120071, ¶ 12. The court may also consider its knowledge of counsel's performance at trial in assessing the defendant's allegations. *Id.*

¶ 42    If the claim pertains solely to matters of strategy or otherwise lacks merit, the court is not required to appoint new counsel. *Jackson*, 2020 IL 124112, ¶ 29. This is true regardless of whether the claim lacks factual merit or lacks legal merit. *People v. Roddis*, 2020 IL 124352, ¶¶ 50, 61. Yet, this does not mean that any claim potentially related to strategy is *per se* exempt under *Krankel. Maya*, 2019 IL App (3d) 180275, ¶ 24.

¶ 43    Where the allegations show possible neglect of the case, the appointment of new counsel is warranted. *People v. Jocko*, 239 Ill. 2d 87, 91 (2010). New counsel would then represent the defendant at a full hearing on his *pro se* ineffective assistance of counsel claims. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). Additionally, appointed counsel will independently evaluate the

defendant's *pro se* claims and avoid the conflict of interest that trial counsel would have in trying to justify his actions or lack thereof. *Jackson*, 2020 IL 124112, ¶ 97. If, following a full *Krankel* hearing, the trial court finds the defendant did not receive the effective assistance of counsel, the court must order a new trial. See *Krankel*, 102 Ill. 2d at 189. As with all ineffective assistance of counsel claims, the defendant's claims are analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Maya*, 2019 IL App (3d) 180275, ¶ 25. To show that trial counsel was ineffective, the defendant must demonstrate that (1) counsel's performance was objectively unreasonable; and (2) that deficient performance prejudiced the defendant. *Jackson*, 2020 IL 124112, ¶ 90.

¶ 44    Here, defendant contends he made a showing of possible neglect based on trial counsel's failure to ask the trial court for funds to procure an expert witness for the defense. We agree.

¶ 45    The record contains ample evidence that Johnson believed it was essential to the defense to obtain an expert witness to rebut Dr. Glick's testimony and the State's theory that L.M.'s injuries were caused by defendant shaking him.[6] Before trial, Johnson told the court that he needed to obtain an expert and his opening statement emphasized the importance of the medical evidence. He stated, "the diagnosis became the entire basis of the prosecution," and the problem "with these shaken baby cases, the science is thrown out." At the preliminary *Krankel* inquiry,

---

[6] The State suggests defendant's arguments pertaining to shaken baby syndrome are irrelevant because Dr. Glick diagnosed L.M. as suffering from abusive head trauma. Yet, the State's brief states that shaken baby syndrome is a subset of abusive head trauma. In addition, defendant was charged with aggravated battery in that he knowingly caused great bodily harm to L.M. by shaking him. Dr. Glick also testified, "[t]here's not many things that cause this *** besides cranial rotational, or the term that's used by lay people is shaking, violent shaking." She repeatedly attributed L.M.'s injuries to cranial rotation or "violent shaking." In closing, the State argued that L.M. had been shaken and that "this violent shaking" occurred after Barbara went to work.

Johnson acknowledged telling defendant that "we need an expert to do this case." Despite this, defendant's attorneys did not procure one.

¶ 46     The State contends that Johnson cannot be faulted for failing to obtain an expert because defendant lacked sufficient funds. The State also argues that defendant could not expect his attorneys to pay for an expert out of their own pockets, a suggestion that defendant has never made. Instead, he has consistently alleged that counsel should have sought funds from the court.

¶ 47                                B. Expert Witness Fees

¶ 48     The State must take steps to ensure that a criminal defendant receives a fair opportunity to present his defense as a matter of due process under the fourteenth amendment. *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985). This principle is partially grounded in the belief that justice cannot be equal where a defendant's poverty denies him the opportunity to meaningfully participate in a judicial proceeding. *Id*. In addition, both the Illinois Constitution and the United States Constitution entitle a defendant to compel the attendance of witnesses on behalf of his defense. *People v. Watson*, 36 Ill. 2d 228, 233 (1966). In that spirit, our legislature enacted section 113-3(d) of the Code of Criminal Procedure:

> "(d) In capital cases, in addition to counsel, if the court determines that the defendant is indigent the court may, upon the filing with the court of a verified statement of services rendered, order the county Treasurer of the county of trial to pay necessary expert witnesses for defendant reasonable compensation stated in the order not to exceed $250 for each defendant." 725 ILCS 5/113-3(d) (West 2016).

Our supreme court, however, has determined that the language of that statute does not go far enough. See *In re T.W.*, 402 Ill. App. 3d 981, 987-88 (2010).

¶ 49    In *Watson*, our supreme court found that the fundamental right to summon witnesses should not be dependent on the financial circumstances of the accused. *Watson*, 36 Ill. 2d at 233. In addition, an expert witness's value lies in his experience and his preparation. *Id*. Thus, a summons alone would be of no value unless the expert had been able to make preparatory findings on which to base his testimony. *Id*. While the supreme court commended the legislative policy behind section 113-3, the court opined that in certain circumstances, that policy should be extended to noncapital felonies. *Id*. at 233-34. Specifically, "[t]he constitutional provisions for compelling the attendance of witnesses make no distinction between capital and noncapital cases and neither should the safeguards for a fair trial." *Id*. at 234. Thus, the court found that an expert might be necessary to set forth a defense even in a non-capital case. *Id*.; see also *People v. Kinion*, 97 Ill. 2d 322, 333-35 (1983) (finding that the judiciary possesses a limited power to exceed the $250 limit set forth in section 113-3 and that experts "must usually be offered a substantial fee as compensation for time spent in making necessary findings and diagnoses and appearing to testify").

¶ 50    Ultimately, *Watson* agreed with the indigent defendant's assertion that the trial court violated his right to due process by denying his motion for funds to obtain the services of an expert in signatures and fingerprints. *Id*. at 229-31. The supreme court found that "the issue of handwriting goes to the heart of the defense" and the opinion of a handwriting expert may have been crucial. *Id*. at 234; see also *Ake*, 470 U.S. at 80 (stating that "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense"); *Kinion*, 97 Ill. 2d at 334 (recognizing that medical doctors are often essential to the

defense of indigent criminal defendants). Thus, the defendant was entitled to a reasonable fee to hire such an expert. *Watson*, 36 Ill. 2d at 234.

¶ 51    It is now well settled in Illinois that the constitutional rights of an indigent, criminal defendant may be violated by denying him funds to secure an expert witness. *People v. Lawson*, 163 Ill. 2d 187, 220 (1994). Where a defendant shows that expert services are necessary with respect to a crucial issue in the case, but he is financially unable to obtain those services, he is entitled to funds for that purpose. *People v. Djurdijulov*, 2017 IL App (1st) 142258, ¶ 48. These principles have been applied to a variety of experts. See, *e.g.*, *Lawson*, 163 Ill. 2d at 228-29 (shoeprint expert); *Djurdijulov*, 2017 IL App (1st) 142258, ¶ 62 (cell phone expert); *People v. Dickerson*, 239 Ill. App. 3d 951, 958 (1992) (handwriting expert). Furthermore, an indigent defendant's retention of private counsel does not preclude an award of fees to obtain an expert. *Djurdijulov*, 2017 IL App (1st) 142258, ¶ 50.

¶ 52                                    C. Deficiency Prong

¶ 53    Here, medical evidence pertaining to the cause and timing of L.M.'s injuries was crucial. As the State acknowledged during closing argument, its case was based on circumstantial evidence. Indeed, only Dr. Glick's testimony that L.M. was subjected to violent shaking immediately before the onset of his symptoms affirmatively excluded the possibility that individuals or causes other than defendant were responsible for L.M.'s injuries. In addition, Johnson's opening statement and motion for a new trial showed he was aware that there was some difference of opinion in the medical community regarding the viability or application of shaken baby syndrome. See also *Ake*, 470 U.S. at 81 (finding that psychiatry is not "an exact science, and psychiatrists disagree widely," making the testimony of psychiatrists crucial as well as a virtual necessity for an insanity plea). Furthermore, Johnson could have requested funds for

an expert without identifying the specific expert he wished to hire or estimating the fees involved. *Lawson*, 163 Ill. 2d at 124-25.

¶ 54     Under these circumstances, no reasonable trial court could have categorically denied a request for funds to hire a defense expert had defense counsel made such a motion. *Cf. People v. Burt*, 168 Ill. 2d 49, 78-79 (1995) (finding, where the defendant had already received the assistance of an investigator and a psychologist to present mitigating evidence, that the appointment of a mitigation expert was not crucial, and that *Ake* did not give him the right to funds to hire a psychiatrist of his choice); *McGill v. Shinn*, 16 F.4th 666, 692 n.8 (9th Cir. 2021) (similar); *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 47 (finding that where a motion to suppress would have been meritless, the defendant could not show possible neglect under *Krankel*).

¶ 55     At the preliminary *Krankel* inquiry, the trial court asked whether the defense had requested funds for an expert from the court. Johnson answered, "I don't recall, Judge. I don't think so. I think we talked briefly about it but never followed through on that." This explanation cannot be considered a strategic decision let alone a sound one. Thus, defendant has shown that counsel's performance may have been deficient. See also *Hinton v. Alabama*, 571 U.S. 263, 273 (2004) (*per curiam*) (finding "it was unreasonable for Hinton's lawyer to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on a mistaken belief that available funding was capped at $1,000").

¶ 56                                D. Prejudice Prong

¶ 57     Defendant's allegations are also sufficient to show possible prejudice. Defendant contends, as he did in his first direct appeal, that the underpinnings of shaken baby syndrome have come under fire and that a defense expert would have undermined Dr. Glick's testimony.

See *People v. Quesada*, 2021 IL App (1st) 190889-U. He cites numerous medical studies and articles to support his allegations. We decline once more to delve into those materials but find nonetheless that the record does not rebut his assertion that assistance from a defense expert would have helped the defense to undermine the bases for Dr. Glick's opinion. Indeed, Johnson appeared to share defendant's belief that a defense expert would have undermined Dr. Glick. To require more from a defendant arguing *pro se* at a preliminary inquiry would gut *Krankel*.

¶ 58    The State suggests that the result of the proceedings would not have been different had defendant obtained a medical expert. The trial court had stated at the *Krankel* inquiry that defendant's conviction "was a product of the quality of the evidence and presentations heard and basically my rejection of [defendant's] testimony when he did testify."  The State's position, however, and the court's finding, put the proverbial cart before the proverbial horse. While the trial court was within rights to find defendant's testimony to be not credible, the burden of proving his guilt nonetheless remains on the State. With additional evidence contradicting Dr. Glick's opinion that defendant caused L.M.'s injuries by violently shaking him, the quality of the State's evidence may have looked somewhat different.

¶ 59    During the preliminary inquiry, the trial court asked Johnson, "if you had retained an expert, if you were able to do that, is there something else you think you could have elicited that was not accomplished on cross-examination of the government's expert?" Johnson's initial answer was equivocal:

>    "Judge, I don't think so. I think maybe it could have brought -- opened some other doors. You know, in this jurisdiction they don't really allow impeaching by treatises, so I don't think, you know, we could have done that either way. But it's always good to have an expert if opposing counsel has an expert."

The court essentially repeated the question, leading Johnson to answer, "I don't believe so." For several reasons, Johnson's answers did not rebut defendant's claim of possible prejudice.

¶ 60    First, the record does not indicate that Johnson ever spoke with an expert about the merits of this case, rendering it is unclear how he could have determined that an expert would not have helped. See also *Maya*, 2019 IL App (3d) 180275, ¶¶ 34-36 (finding the trial court's determination that no possible neglect occurred was manifestly erroneous where the preliminary inquiry permitted defense counsel to shed some light on an ineffective assistance of claim that was not rebutted by the record and the trial court asked no questions about that claim). In addition, Johnson conceded that having a defense expert could have "opened some other doors." Even before trial, Johnson had repeatedly stated that he believed an expert was necessary. See also *Ake*, 470 U.S. at 80 (finding that a psychiatrist would "know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers" and could identify elusive and deceptive symptoms of insanity); *Lawson*, 163 Ill. 2d at 229 (finding that trial counsel's cross-examination of the State's expert could not constitute a sufficient defense because counsel was unfamiliar with this type of evidence and, without the help of an expert, counsel could not sufficiently attack the scientific basis for the opinions of the State's expert).

¶ 61    Aside from helping defense counsel to formulate a strategy and cross-examine Dr. Glick, a defense expert could have transformed this case into a battle of experts. Instead, the State's expert was essentially pitted against defendant, a layman.

¶ 62    For similar reasons, we reject the State's assertion that any error was harmless. The failure to appoint new counsel to present the defendant's *pro se* posttrial claims following a preliminary inquiry can constitute harmless error. *Jackson*, 2020 IL 124112, ¶ 112. In order for us to find harmless error, however, we require a record showing the meritless nature of the

defendant's *pro se* claims. See *Moore*, 207 Ill. 2d at 80; *Dickerson*, 239 Ill. App. 3d at 958. As stated, our record does not demonstrate that defendant's allegations are meritless.

¶ 63                                    E. Remand

¶ 64    Defendant has made a showing of possible neglect by trial counsel in that counsel failed to request funds from the court to hire a defense expert with respect to a critical issue in the case. Thus, we remand this matter for the appointment of new counsel and a full *Krankel* hearing. We note that defendant's allegations will almost certainly require new counsel to confer with an expert to determine whether such assistance may have led to a different result at trial. In light of our determination, we need not consider defendant's remaining assertion that he made a showing of possible neglect because counsel encouraged defendant to waive a jury trial due to counsel's alleged friendship with the trial judge. We also need not consider the ineffective assistance of counsel claims raised by counsel on appeal. On remand, appointed counsel will have the opportunity to pursue these claims.

¶ 65    We also note that while the trial court gave Johnson the opportunity to respond to *all* of defendant's *pro se* allegations at the preliminary inquiry, Johnson did not do so. Among other things, Johnson did not address defendant's allegations regarding Johnson's advice to choose a bench trial or his failure to obtain the camcorder footage of a detective who was allegedly the first to respond to the scene. In addition, Johnson did not address defendant's assertion that Johnson labored under a conflict of interest due to his representation of Barbara, a conflict that he would not have waived had he been informed of another option. These assertions all involve matters outside the record. See also *People v. Morgan*, 2017 IL App (2d) 150463, ¶¶ 18-20 (finding that the trial "court could not rely on its observations of counsel, because defendant's claim was not based on counsel's in-court performance"); *cf. People v. Banks*, 237 Ill. 2d 154,

215 (2010) (finding that the trial court's inquiry did not need to be lengthy where "[t]he court was already familiar with the substance of defendant's complaint regarding his counsel since it was presented on the two prior occasions"). Furthermore, several inaccurate statements regarding what ensued at trial were made during the preliminary inquiry, likely due to the passage of time. For example, Johnson and Galler's response to defendant's assertion that Johnson failed to obtain or present the 911 call erroneously represented that the 911 call was, in fact, presented at trial.

¶ 66    We urge all involved to thoroughly refresh their recollection of defendant's trial. In the spirit of *Krankel*, we also encourage the parties and the trial court to flesh out these and any other grievances defendant may have against counsel to prevent them from resurfacing later. We make no findings, however, with respect to the merits of his claims.

¶ 67    Finally, we deny defendant's request to have this matter transferred to another trial judge. "Trial judges are presumed to be impartial, as it is assumed that judges will be able to set aside any biases or predispositions they might have." *People v. Conway*, 2023 IL 127670, ¶ 22. Only the most extreme circumstances justify disqualifying the trial judge due to bias. *Id*. In contrast, our review of the record reveals no indication that the trial judge is unable to remain impartial or abstain from bias and predisposition, notwithstanding that he ruled against defendant. See *Id*. ¶¶ 23-26 (finding that the trial court's comments reflected a credibility determination, not bias).

¶ 68                                III. Conclusion

¶ 69    We reverse the trial court's denial of relief following a preliminary *Krankel* inquiry and remand for the appointment of new counsel and a full hearing on defendant's claims of ineffective assistance of counsel.

¶ 70    Reversed and remanded.